IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:

1. The Tribe's motion for relief, Filing No. 271, should be and hereby is granted; and

2. All fines against the Tribe are hereby permanently suspended effective May 15, 2001.

UNITED STATES of America,
Plaintiff,

v.

James ARCHAMBAULT, a/k/a
James Skunk, Defendant.

No. CR 00–30089.

United States District Court,
D. South Dakota,
Central Division.

Oct. 18, 2001.

Report and Recommendation
July 13, 2001.

Supplemental Report and Recommendation September 12, 2001.

---

Thomas J. Wright, Assistant United States Attorney, Pierre, SD, for plaintiff.

Thomas P. Maher, Pierre, SD, for defendant.

## ORDER

KORNMANN, District Judge.

[¶ 1] Defendant filed a motion to dismiss (Doc. 26) which motion is based on claims of double jeopardy, claimed violations of constitutional rights of due process and equal protection, and a claimed bill of attainder. The parties initially briefed the issues. U.S. Magistrate Judge Moreno conducted a hearing at which certain facts were stipulated and defendant was permitted to supplement the record (H.Tr.8–10, Doc. 30). The magistrate filed and served a report and recommendation (Doc. 35), recommending that the motion be denied.

[¶ 2] I conducted a *de novo* review of the transcript of the hearing and all the files and records herein. Defendant timely filed objections and a request for a remand, or more correctly for a recommittal (Doc. 45). One basis for the recommendation to deny the motion was the Eighth Circuit's *en banc* decision in *United States v. Weaselhead*, 165 F.3d at 1209. The opinion of the district court, *United States v. Weaselhead*, 36 F.Supp.2d 908 (D.Neb.1997), was affirmed by an equally divided court. The portion of the report

and recommendation of the magistrate relying in part on the *en banc* decision was rejected by me as an erroneous statement of the law. The *en banc* decision is not binding precedent. Decisions by an equally divided court decide only the particular case. They have no precedential effect. They have a *res judicata* effect but not a *stare decisis* effect. *See Loeffler v. Tisch,* 806 F.2d 817 (8th Cir.1986), *United States v. Grey Bear,* 863 F.2d 572 (8th Cir.1988), *Redding v. Minnesota,* 881 F.2d 575 (8th Cir.1989), and *United States v. Payne,* 940 F.2d 286 (8th Cir.1991).

[¶ 3] As to the balance of the report and recommendation, I acted pursuant to 28 U.S.C. § 636(b)(1)(C) to recommit the matter to the magistrate for two reasons. First, neither the parties nor the magistrate initially gave consideration to a case decided by the United States Supreme Court on June 25, 2001, *Nevada v. Hicks,* — U.S. ——, 121 S.Ct. 2304, 150 L.Ed.2d 398. Nor was any consideration given to *Hicks* by any judge in *United States v. Enas,* 255 F.3d 662 (9th Cir.2001). While *Hicks* is a civil case and thus not "on point", the various Justices discuss in *Hicks* the various aspects of tribal court jurisdiction. It can be argued that the opinion of the Supreme Court is that any tribe's adjudicative jurisdiction over non-members is at most only as broad as the jurisdiction granted legislatively by Congress. Second, I initially believed that the additional evidence sought by the defendant might be relevant. At a minimum, I believed that the defendant was entitled to have all such evidence a part of the record, either as admitted into evidence or as an offer of proof. I therefore, on July 26, 2001, recommitted the matter (Doc. 46) with instructions to the magistrate.

[¶ 4] The magistrate proceeded in accordance with the order of recommittal. Defendant filed and served an offer of proof

(Doc. 85). The magistrate served and filed a supplemental report and recommendation (Doc. 93). Defendant served and filed objections (Doc. 97) to the supplemental report and recommendation. I have again given *de novo* consideration to all documents and records in this case.

■ [¶ 5] The issue squarely before the court has not been directly decided by the United States Supreme Court or by the United States Court of Appeals for the Eighth Circuit. Despite the *Hicks* case and the other Supreme Court cases indicating skepticism as to any claimed "inherent sovereignty" of Indian tribes acting through their tribal courts, it is not the function of a district court to predict what the Supreme Court will do in a given case. It is a virtual certainty that this ruling on the motion to dismiss, however decided, will be appealed and the Eighth Circuit will again be presented with the "opportunity" to rule on the same issue presented in *United States v. Weaselhead,* 156 F.3d 818 (8th Cir.1998). Although the panel decision was vacated on December 4, 1998, it is difficult to add to the scholarly discussions in both the panel opinion by Chief Judge Wollman and the dissent by Judge Morris Sheppard Arnold. It is also difficult to add to the scholarly opinion of United States District Judge Thomas Shanahan in *United States v. Weaselhead,* 36 F.Supp.2d 908 (D.Neb.1997). We do not know, based upon a different make-up of the Court of Appeals, whether the views of Chief Judge Wollman or Judge Morris Sheppard Arnold will carry the day. Indeed, their views of the law may have changed.

[¶ 6] Defendant Archambault, like Mr. Weaselhead, is an Indian prosecuted by a tribe (in this case the Cheyenne River Sioux Tribe) as to which he is not an enrolled member. Archambault, like Weaselhead, pled guilty to having violated

the tribal code and was later prosecuted for the exact same conduct by the United States government. Archambault admitted in tribal court to having assaulted and injured his domestic companion, a member of the Cheyenne River Sioux Tribe, and that the assault occurred on the reservation. Archambault, like Weaselhead, claims double jeopardy, the claim being that the tribe had no inherent authority to prosecute him and that the only basis for such authority comes from a federal statute. Thus, as the argument goes, the two prosecutions stem from the same authority, the United States government, the bottom line being that only one sovereign is involved as to Archambault. Obviously, if the tribal prosecution was based on inherent tribal sovereignty, two sovereigns are involved as to Archambault and there is no double jeopardy.

[¶ 7] Tribes have historically prosecuted nonmember Indians for misdemeanor offenses committed within the territory of such tribe. Congress recognized this fact as part of the legislative history in the enactment of Pub.L. No.102–137. *See* 137 Cong.Rec. E2165–04 in which then Congressman George Miller stated the acknowledgment of the Congressional committee that tribes "have always been able to exercise misdemeanor criminal jurisdiction over all Indians on tribal lands." Such prosecutions came to a halt in the Eighth Circuit with the decision in *Greywater v. Joshua*, 846 F.2d 486 (8th Cir. 1988), holding that a tribe has no inherent sovereignty to prosecute nonmember Indians. "We find the Devils Lake Sioux Tribe's exercise of criminal jurisdiction over nonmember Indians beyond what is necessary to protect the rights essential to the Tribe's self-government and inconsistent with the overriding interest of the federal government in ensuring that its citizens are protected from unwarranted intrusions upon their personal liberty. We

thus conclude that the Tribe's authority to prosecute nonmember Indians is nonexistent." *Id.* at 493. *Greywater* cited and relied upon *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), and *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). *Greywater*, while acknowledging *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), engaged in no discussion of the *Montana* factors. *Greywater*, in refusing to adopt the rationale of *Duro v. Reina*, 821 F.2d 1358 (9th Cir.1987), correctly forecast the reversal of the Ninth Circuit in *Duro v. Reina*, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). Tribes across the United States then ceased prosecuting Indian non-tribal members. There was at that time, as we know, no Congressional action with regard to any claimed inherent sovereignty of tribes to prosecute nonmember Indians.

[¶ 8] Congress acted promptly by virtue of Pub.L. No. 102–137 to amend the Indian Civil Rights Act, codified at 25 U.S.C. § 1301–03 (1994), by expressing the inherent power of Indian tribes to exercise criminal jurisdiction over all Indians in Indian Country. *See* 25 U.S.C. § 1301(2). Congress specifically found that this was a power of self-government which Congress recognized and affirmed as having always existed and which had never been "taken away" by Congress.

[¶ 9] There are perhaps three possibilities as to what Congress did as a matter of law. First, Congress simply acted to expressly grant and legislatively delegate to tribes the authority to prosecute nonmember Indians, curing what *Duro* found did not exist. Second, the Congressional finding of inherent sovereignty by tribes over

nonmember Indians is a nullity, the reason being that *Duro* was decided based upon the United States Constitution. Third, Congress did not delegate anything or act in a substantive manner but simply defined what the federal common law has always been. The ultimate question becomes: who is permitted to define what sovereign powers tribes may have lost or may have retained upon being incorporated into the United States? Is it Congress or is it the judiciary?

 [¶ 10] Intertwined, of course, are possible constitutional questions as to whether nonmember Indians may be treated differently than nonmember non-Indians. It is beyond dispute that non-Indians may not be prosecuted criminally in any tribal court. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 195, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). The matter is further complicated by the fact that the Bill of Rights does not apply to Indians in tribal courts. *See Duro,* 495 U.S. at 693, 110 S.Ct. 2053, and *Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896) (although dealing with the question of whether cases in tribal court could be prosecuted without an indictment by a grand jury). We know that the Indian Civil Rights Act of 1968 does not guarantee the same rights that other Americans have. There is no right to counsel at public expense for Native Americans who are indigent and charged in tribal court. This is despite the fact that our reservations, in terms of poverty, are national disgraces. I take judicial notice of the fact that the vast majority of tribal courts in the District of South Dakota do not provide lawyers for indigents. Some provide lay assistance. Some provide nothing. Some provide a lawyer, the public defender. Other than being locked in a tribal jail for some period of time, there are possible collateral consequences to being convicted in tribal court. While tribal court convictions do not count in computing the criminal history of a person who is later convicted and sentenced in federal court, such convictions may be considered under U.S.S.G. § 4A1.3 (adequacy of criminal history category). *See* U.S.S.G. § 4A1.2(i). The government sometimes argues for an upward departure based upon a defendant's previous convictions or even charges pending in tribal court. Upward departures are sometimes ordered based on tribal court histories. Such convictions are certainly matters to be considered by the sentencing judge. *See* U.S.S.G. § 1B1.4 under which the judge "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." *See* 18 U.S.C. § 3661.

[¶ 11] Archambault argues that Congress did nothing other than legislatively delegate to the tribe the authority to prosecute him as a nonmember Indian. A very troubling aspect to this argument is that it can be contended that Congress could not constitutionally so delegate without extending all constitutional protections. This full panoply of protections, as discussed above, is not found in tribal courts or by virtue of the Indian Civil Rights Act. What is the possible basis for the contention that Congress could not delegate any such thing? "Our cases suggest constitutional limitations even on the ability of Congress to subject American citizens to criminal proceedings before a tribunal that does not provide constitutional protections as a matter of right. *Cf. Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) ... We decline to produce such a result through recognition of inherent tribal authority." *Duro,* 495 U.S. beginning at 693, 110 S.Ct. 2053. Examining such language, Indian tribal members are of course "American citizens" being brought before a tribunal, albeit of their own tribe, that

does not provide constitutional protections as a matter of right. Given the fact that Congress had not then acted to even arguably delegate any authority to prosecute nonmember Indians, I interpret the quoted language as nothing more than *dicta*. I certainly decline any thought of judicially amending the Indian Civil Rights Act to conform to the Bill of Rights.

[¶ 12] Archambault has attempted to establish that the tribal court was, in effect, a creature or arm of the United States government (and thus without sovereignty as to criminal prosecutions) because of the annual multi-million dollar federal appropriations made to the tribe for police, courts, and prosecutors. The magistrate found that this evidence had no relevance and I agree. Common sense tells us that the vast majority of the expenditures are in connection with the tribe prosecuting its own enrolled members rather than Indian nonmembers. Carried to its logical conclusion, the argument of the defendant would mean that, given the federal appropriations to states, counties and municipalities for law enforcement purposes, states would not be separate sovereigns but merely agents of the federal government. This simply makes no sense.

[¶ 13] The magistrate, in recommending that the motion to dismiss be denied, relied largely on *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Under *Montana*, a tribe may retain inherent power to exercise jurisdiction over a nonmember Indian when that person's conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566, 101 S.Ct. 1245. *Montana* dealt with hunting and fishing rights of non-Indians on land owned in fee by non-Indians, although contained within the reservation boundaries. Here, Archambault and the victim lived as "husband and wife" in a house owned by the tribe or more correctly an Indian Housing Authority. Their three children lived with them. I acknowledge and agree with the statements of the magistrate that the tribe's political integrity would be threatened greatly if the tribe would be unable to prosecute a nonmember Indian who has assaulted a tribal member on the reservation. The question of the power to prosecute a nonmember Indian in tribal court is not, however, the issue. There is no question that a tribe has the authority to do that, whether by virtue of inherent jurisdiction that has always existed (as confirmed by Congress) or by virtue of a legislative delegation of such power by Congress to the tribe. The tribe's ability to prosecute violent nonmember Indians is not in question. If the 1990 amendments to the Indian Civil Rights Act constitute only a delegation of power to tribal courts, it would be clear that nonmember Indians who have been prosecuted in tribal court under circumstances in which jeopardy has attached could not again be charged with essentially the same offense in federal court.

[¶ 14] There can be serious problems and concerns with regard to tribal prosecutions of nonmember Indians. First, tribal officials might well hesitate to promptly arrest, charge and try a nonmember Indian who has committed some serious act of violence. This is assuming, of course, that tribal authorities could readily determine that the alleged offender was not an enrolled member. This information is not always readily available or ascertainable. There is, of course, no registration system on any reservation for nonmembers residing within the confines of that reservation. Since the defendant has the right to remain silent, tribal officials might have to be in touch with numerous other tribes to determine the actual tribal membership of the person in

question. Are tribal authorities to stay their hands with a drunk, disorderly and perhaps dangerous member of a family unit until they can investigate whether the suspect is a member of that tribe or some other tribe? If tribal authorities knew they were dealing with a nonmember Indian, they would certainly carefully consider the danger that a plea of guilty would later forestall any federal prosecution under the Major Crimes Act, 18 U.S.C. § 1153. If it is likely that the serious nature of a given case will later justify a federal prosecution, it would seem all the more important for tribal authorities to remove the suspect from the home or other location and place the person in custody. Yet, if the nonmember is charged and in custody for the tribal offense, how would tribal officials prevent the nonmember defendant from almost immediately entering a plea of guilty in tribal court? That is exactly what Archambault did here. A great influx of additional agents of the Federal Bureau of Investigation and Assistant United States Attorneys would be required to be available for consultation and an immediate guess as to whether some alleged criminal act might later justify a federal prosecution of a person first determined to be a nonmember Indian. The Major Crimes Act, as we know, extends federal jurisdiction over the enumerated crimes committed by "[a]ny Indian in Indian Country." Enrolled members of the tribe would be subject to two prosecutions and tribal officials could promptly act to arrest, charge and attempt to convict those known member Indians in tribal court without fear of endangering a later federal prosecution. Tribal members would be subject to the awful and discriminatory impact of the federal sentencing guidelines in federal court. Nonmember Indians would not unless they were at least conceivably allowed to "run at large" until the federal government could marshal its

forces through the Federal Bureau of Investigation and the United States Attorney's office. These concerns and these potential* differences as to treatment of tribal members and nonmembers (including protection of the public from violent nonmember Indians) would certainly appear to have a direct effect on the political integrity and the welfare of the tribe. We must keep in mind also that tribal courts have very limited criminal jurisdiction. They cannot impose more than one year of imprisonment or a fine of $5,000.00 or both. 25 U.S.C. § 1302(7). Each tribe would be forced into a situation where it would be treating some of its own members more harshly than nonmembers. How long would a tribal government survive who acted in such fashion? Tribal judges and tribal prosecutors are not protected from political influences as are federal judges and federal prosecutors.

[¶ 15] It is clear that, if *Montana* provides the test, the motion of the defendant should be denied because there is no double jeopardy. *Montana*, however, did not deal with issues of double jeopardy or inherent sovereignty for the tribe to prosecute nonmember Indians.

[¶ 16] The report and recommendation does not discuss *South Dakota v. Bourland*, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). The issue before the Court cannot be decided without some consideration of *Bourland*. The panel decision in *Weaselhead* noted that *Bourland* was issued "after the changes (the legislation in which Congress acted to "undo" *Duro* ) had been enacted and permanently codified ..." 156 F.3d at 823. This, of course, is a fact and not a legal theory. *Bourland*, however, did not involve issues of double jeopardy and inherent sovereign powers of a tribe to prosecute nonmember Indians for offenses committed on the reservation. *Bourland* answered the ques-

tion whether this same tribe had the authority to regulate hunting and fishing by non-Indians on lands and overlying waters located within the tribe's reservation which lands had been acquired by the United States for the operation of the Oahe dam and reservoir on the Missouri River. We know that the Supreme Court did not address the tribe's regulatory jurisdiction over nonmember Indians since that issue was neither pled nor tried. *See* 508 U.S. at 685, n. 6, 113 S.Ct. 2309. I therefore believe that *Bourland* does not answer or even suggest the answer to the question here presented as to inherent sovereignty. The majority opinion by Justice Thomas addressed in a rather narrow context the question of inherent tribal sovereignty.

> The dissent's complaint that we give "barely a nod" to the Tribe's inherent sovereignty argument is simply another manifestation of its disagreement with *Montana*, which announced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450 U.S. at 565, 101 S.Ct. at 1258. While the dissent refers to our "myopic focus" on the Tribe's prior treaty right to "absolute and undisturbed use and occupation" of the taken area, it shuts both eyes to the reality that after *Montana*, tribal sovereignty over nonmembers "cannot survive without express congressional delegation," 450 U.S. at 564, 101 S.Ct. at 1258, and is therefore *not* inherent.

508 U.S. at 695 n. 15, 113 S.Ct. 2309, 124 L.Ed.2d 606 (internal citations omitted).

[¶ 17] At least one court believes that the panel decision in *Weaselhead* was wrongly decided. *See United States v. Enas*, 255 F.3d 662, 674–75 (9th Cir.2001) (*en banc*). Law review authors have criticized it. *See* Frank Pommersheim, "Our Federalism" in the Context of Federal Courts and Tribal Courts: An Open Letter to the Federal Courts' Teaching and Scholarly Community, 71 U.Colo.L.Rev. 123, 175–79 (2000); Nancy Thorington, Civil and Criminal Jurisdiction Over matters Arising in Indian Country: A Roadmap for Improving Interactions Among Tribal, State and Federal Governments, 31 McGeorge L.Rev. 973, 1000–01 (2000); Christopher B. Chaney, The Effect of the United States Supreme Court's Decisions During the Last Quarter of the Nineteenth Century on Tribal Jurisdiction, 14 B.Y.U.J.Pub.L. 173, 179–80 (2000); Philip P. Frickey, A Common Law For Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority Over Nonmembers, 109 Yale L.J. 1, 85 n. 322 (1999); *see also* Note, Dispelling The Constitutional Creation Myth of Tribal Sovereignty, United States v. Weaselhead, 78 Neb.L.Rev. 162, 180–204 (1999). I have recently read "A Slippery Slope", authored by Ben Welch in the October 2001 American Indian Report. That article traces the history of important decisions and legislation affecting tribes, Native Americans and states.

■ [¶ 18] I believe that we are dealing with a matter of federal common law. I do not believe the Congress acted beyond its authority. I do not believe that *Duro* was founded on constitutional principles but rather on a finding by the judiciary as to what the federal common law was. Federal common law has since *Duro* been clarified by Congress. It now exists just as Felix Cohen described it in 1945 in the first compendium of federal Indian law, Handbook of Federal Indian Law, namely that the rights of a tribe to sovereignty and self-government are only restricted if the federal government, acting through the Congress, expressly extinguishes those rights, wholly or in part. Mr. Cohen was quoted in *United States v. Wheeler*, 435

U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), to the effect that tribes possess "inherent powers of a limited sovereignty which has never been extinguished." By virtue of the action of the United States Congress declaring the federal common law, the tribe here exercised inherent sovereignty. There is no double jeopardy and the motion to dismiss should be denied. The motion should also be denied as to the claims of a bill of attainder and as to claims of violations of constitutional rights of due process and equal protection. Nonmember Indians will simply be subjected to the same tribal court systems as member Indians. Indians who choose to leave their own reservations and live on another reservation make such choices in a conscious manner. They will receive the same treatment and rights as all other Indians living on that particular reservation.

[¶ 19] Now, therefore,

[¶ 20] IT IS ORDERED, as follows:

1) The conclusions of the report and recommendation (Doc. 35) and the supplemental report and recommendation (Doc. 93) are adopted as modified herein.

2) The objections of the defendant (Doc. 97) are overruled.

3) The motion to dismiss the indictment (Doc. 26) is denied.

4) The offer of proof (Doc. 85) is rejected.

[¶ 21] Dated at Pierre, South Dakota, this 16th day October, 2001.

REPORT AND RECOMMENDATION FOR DISPOSITION OF DEFENDANT'S MOTION FOR DISMISSAL

MORENO, United States Magistrate Judge.

I.

[¶ 1] Defendant, James Archambault, aka James Skunk (Archambault), filed a Motion for Dismissal and supporting Memorandum on June 19, 2001. Docket Nos. 26–27. After plaintiff, United States of America (government), filed a written response to the Motion, Docket No. 28, and Archambault filed a Supplemental Memorandum, Docket No. 30, a hearing was held at which certain facts were stipulated to and Archambault was allowed to supplement the record. H.Tr. 8–10; Docket No. 33. Because Archambault's Motion is a dispositive one, this Court is only authorized to determine the same on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following report and recommendation for disposition of Archambault's Motion.

II.

[¶ 2] Archambault is an adult Indian male and an enrolled member of the Standing Rock Indian Tribe. Docket No. 33. On October 19, 2000, he pled guilty to domestic violence and to endangering the welfare of a child in Cheyenne River Sioux Tribal Court and was sentenced to a one year jail term, with six months suspended on conditions, and ordered to pay a fine and court costs. Docket No. 27, Ex. A.

[¶ 3] On December 14, 2001, a federal grand jury returned a single count indictment charging Archambault with assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153 and 113(a)(6). Docket No. 1. The parties do not dispute that the assault charge involves the same conduct as the domestic violence offense for which Archambault had already been prosecuted, convicted and sentenced by the Cheyenne River Tribal Court. Hrg. Tr. 9.

[¶ 4] In response to the indictment, Archambault filed a Motion for Dismissal

with supporting Memoranda, alleging that the subsequent federal prosecution was barred by the Double Jeopardy Clause, that his due process and equal protection rights were violated and that 25 U.S.C. § 1301 constitutes an impermissible bill of attainer. Docket Nos. 26, 27, 30.

### III.

[¶ 5] The Fifth Amendment's Double Jeopardy Clause provides that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." This constitutional guarantee prohibits "a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense." *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 769 n. 1, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); *see also North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The rationale behind the doctrine is this: if, in the course of a single act, a person violates the laws of two sovereigns, he has committed two separate crimes for which each sovereign has an independent right to prosecute him for. *Heath v. Alabama*, 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922).

[¶ 6] This Court thus must determine whether the two entities that prosecuted Archambault, namely the Cheyenne River Sioux Tribe (CRST) and the government, are "separate sovereigns" for purposes of the Double Jeopardy Clause. In order to do so, the Court must ascertain "the ultimate source of power under which the respective prosecutions were undertaken." *United States v. Wheeler*, 435 U.S. 313, 320, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *see also, Heath*, 474 U.S. at 88, 106 S.Ct. 433.

### IV.

[¶ 7] When Indian tribes are involved, it is difficult to determine double jeopardy violations because tribes exercise various forms of power that emanate from different sources. On the one hand, tribes are autonomous sovereigns, that is, they retain all power that is not "inconsistent with their status" as "conquered and dependent" nations. *United States v. Enas*, No. 99–10049, 2001 WL 726669 at *3 (9th Cir. June 29, 2001) (*en banc*), (*quoting Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 196, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978)) This kind of authority, referred to as "inherent", *Wheeler*, 435 U.S. at 329, 98 S.Ct. 1079, or "retained", *id.* at 327, 98 S.Ct. 1079; *Duro v. Reina*, 495 U.S. 676, 679, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), is the power tribes need to control their own internal relations and to preserve their own unique customs and social order, *Duro*, 495 U.S. at 685–86, 110 S.Ct. 2053.

[¶ 8] On the other hand, "[t]he sovereignty that Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." *Wheeler*, 435 U.S. at 323, 98 S.Ct. 1079; *see also United States v. Wadena*, 152 F.3d 831, 843 (8th Cir.1998), *cert. denied*, 526 U.S. 1050, 119 S.Ct. 1355, 143 L.Ed.2d 517 (1999). When Congress bestows additional power upon a tribe, Congress has delegated an aspect of the government's own sovereignty to the tribe. *Duro*, 495 U.S. at 687, 110 S.Ct. 2053; *Wheeler*, 435 U.S. at 328, 98 S.Ct. 1079; *Oliphant*, 435 U.S. at 208, 98 S.Ct. 1011.

[¶ 9] The distinction between inherent and delegated power is critical for purposes of determining a double jeopardy violation. When an Indian tribe acts pursuant to its inherent power, the dual sover-

eignty doctrine permits federal and tribal prosecutions for the same offense. *Enas*, 255 F.3d 662, 666–67. But when a tribe acts based on power delegated to it by Congress, the Double Jeopardy Clause prohibits duplicative tribal and federal prosecutions. *Id.*

[¶ 10] The paramount question here is whether CRST, in prosecuting Archambault, was exercising its inherent power or power that was delegated to it by Congress. If the former is true, the federal prosecution can continue; if the latter is the case, the assault charge must be dismissed as violative of the Double Jeopardy Clause. Before this question can squarely be addressed, *Duro* and the 1990 amendments to the Indian Civil Rights Act (ICRA) and other relevant cases, from both the Eighth Circuit and elsewhere, must be examined.

## V.

[¶ 11] In 1978, the Supreme Court held that the Double Jeopardy Clause did not preclude the government from successively prosecuting a tribal member defendant under the Major Crimes Act.[1] *Wheeler*, 435 U.S. at 326, 98 S.Ct. 1079. The Supreme Court's holding was based on the notion that Indian tribes constitute separate sovereigns for purposes of the Double Jeopardy Clause. *Id.* at 329–30, 98 S.Ct. 1079. The Court reasoned that the exercise of criminal authority over tribal members was an aspect of non-divested inherent tribal authority and was not based on delegated federal authority. *Id.*

[¶ 12] Scarcely more than two weeks before *Wheeler* was handed down, the Supreme Court decided *Oliphant*. In *Oliphant*, the Court determined that Indian tribes could not exercise criminal jurisdiction over non-Indians in the absence of an affirmative delegation of such power by Congress. 435 U.S. at 208, 98 S.Ct. 1011. According to the Court, upon their incorporation into the United States, Indian tribes came under and were subject to the sovereignty of the United States and their rights to complete sovereignty, as independent nations, were diminished. *Id.* at 208–09, 98 S.Ct. 1011.

[¶ 13] In *Duro*, the Supreme Court extended the judicial divestiture of sovereignty enunciated in *Oliphant*, holding that an Indian tribe could not assert jurisdiction over a defendant who was an Indian but not a tribal member. In reaching this conclusion, the Court observed that the power to prosecute non-member Indians "was a power necessarily surrendered by the tribes in their submission to the overriding sovereignty of the United States." 495 U.S. at 693, 110 S.Ct. 2053. Stated another way, tribes had no inherent power to prosecute non-member Indians.

[¶ 14] With this trio of cases, the paradigm had been completed: the inherent powers of Indian tribes included only those required for internal self-governance and in the absence of authority delegated by Congress, the sovereign rights of tribes to prosecute criminal offenders did not go beyond tribal members.

[¶ 15] Congress reacted swiftly to the *Duro* decision by passing the 1990 amendments to the ICRA. The amendments redefined the statute's definition of "powers of government" to include "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." 25 U.S.C. § 1301(2). It also created a definition of "Indian", as "any person who would be subject to the jurisdiction of the United States as an Indian under section 1153 of

---

1. *See* 18 U.S.C. § 1153 and 18 U.S.C. § 3242 (giving federal courts exclusive jurisdiction over certain crimes committed in Indian country by both Indians and non-Indians).

Title 18 if that person were to commit an offense listed in that section in Indian country to which that section applies." 25 U.S.C. § 1301(4).

[¶ 16] These amendments reflect an attempt by Congress to "legislatively override" *Duro* by expressly recognizing and affirming that an Indian tribe's "inherent" sovereign status has always included criminal jurisdiction over non-member Indians. This intention is plain from the text of the amendments and their legislative history. *See, e.g.*, 137 Cong.Rec. H2988–01 (May 14, 1991), 1991 WL 77806 (statement of Rep. Miller) ("[T]his bill recognizes an inherent tribal right which always existed. It is not a delegation of authority but an affirmation that tribes retain all rights not expressly taken away."); H.R.Conf.Rep. No. 102–261, at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N. 379 ("The Committee of Conference is clarifying an inherent right which tribal governments have always held and was never questioned until the recent Supreme Court decision of *Duro v. Reina,* [495 U.S. 676,] 110 S.Ct. 2[0]53[, 109 L.Ed.2d 693] (1990)."); *see also, Mousseaux v. United States Commissioner of Indian Affairs,* 806 F.Supp. 1433, 1442–43 (D.S.D.1992), *aff'd in part and remanded in part on other grounds,* 28 F.3d 786 (8th Cir.1994).

[¶ 17] It appears that *Duro* and the 1990 amendments to the ICRA are in direct conflict. The critical question, therefore, becomes whether Congress, in the face of *Duro* and the Supreme Court's pronouncements therein, had the authority to pass the amendments and clarify its vision of tribal sovereignty.

## VI.

[¶ 18] Before delving into this separation of powers thicket, it is appropriate that consideration be given to the decisions of other courts which have discussed the interplay between *Duro* and the 1990 amendments and the "inherent" versus "delegated" power issue.

[¶ 19] In *United States v. Weaselhead,* 36 F.Supp.2d 908 (D.Neb.1997), *affirmed by an equally divided court,* 165 F.3d 1209 (8th Cir.) (*en banc* ), *cert. denied,* 528 U.S. 829, 120 S.Ct. 82, 145 L.Ed.2d 70 (1999), the Eighth Circuit wrestled with the same issue that confronts this Court. The case began in the District of Nebraska, where the defendant, an enrolled member of the Blackfoot Indian Tribe of Montana, sought to dismiss a federal indictment on double jeopardy grounds because he had previously been prosecuted and convicted in Winnebago Tribal Court. The district court held that the Winnebago Tribe exercised its inherent sovereignty when it prosecuted the defendant and that the subsequent federal prosecution of him did not violate the Double Jeopardy Clause. 36 F.Supp.2d at 915.

[¶ 20] A divided panel of the Eighth Circuit reversed. The *Weaselhead* majority determined that what sovereign powers Indian tribes inherently possess is a constitutional matter that must be decided by the Supreme Court and not Congress:

We conclude that ascertainment of first principles regarding the position of Indian tribes within our constitutional structure of government is a matter ultimately entrusted to the [Supreme] Court and thus beyond the scope of Congress's authority to alter retro-actively by legislative fiat. Fundamental, *ab initio* matters of constitutional history should not be committed to "[s]hifting legislative majorities" free to arbitrarily interpret and reorder the organic law as public sentiment veers in one direction or another.

Prior to the post-*Duro* amendment[s], criminal jurisdiction over non-member Indians did not exist, as it had been

"necessarily surrendered by tribes in their submission to the overriding sovereignty of the United States." Although Congress presumably acted within its power in delegating criminal jurisdiction over non-member Indians to the tribes, it was beyond Congress's power to declare existent a non-sovereignty based jurisdiction that the Court has declared to be nonexistent.

156 F.3d at 824 (citations omitted).

[¶ 21] Judge Morris Sheppard Arnold dissented. In Judge Arnold's view, "the question of what powers Indian tribes inherently possess ... has always been a matter of federal common law," and as such, "Congress has the power to expand and contract the inherent sovereignty that [ ] tribes possess because it has legislative authority over federal common law." 156 F.3d at 825.

[¶ 22] The *Weaselhead* panel decision was later vacated and the Eighth Circuit, sitting *en banc,* affirmed the district court's decision by an evenly-divided vote. 165 F.3d at 1209.

[¶ 23] Just recently, the *en banc* court in *Enas,* considered the issue presented in this case and unanimously held that the Double Jeopardy Clause was not transgressed by the federal prosecution of a non-member Indian. 255 F.3d 662, 675–76, 682–83. The *Enas* court concluded that (1) Congress had the power to determine that tribal jurisdiction over non-member Indians was inherent, (2) acting under the 1990 amendments to the ICRA, the White Mountain Apache Tribe prosecuted the defendant pursuant to its own inherent power and (3) the federal prosecution could proceed because it was based on a separate power source, and the dual

sovereignty doctrine applied and permitted successive tribal and federal prosecutions of the defendant. *Id.* at 675–76. Four judges concurred in the result, believing that there was no need to engage in a separation of powers analysis because the Apache Tribe prosecuted the defendant pursuant to its own inherent sovereign authority. *Id.* at 675–83.[2]

## VII.

This Court agrees with the reasoning and rationale of the Court in *Enas* and that of Judge Arnold's dissenting opinion in *Weaselhead.*

It is axiomatic that when Congress and a court disagree and the issue is a constitutional one, the court's decision prevails. *See Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). In contrast, when Congress and a court are at odds over a statutory interpretation issue, Congress has the last word. M. Solimine & J. Walker, *The Next Word: Congressional Response to Supreme Court Statutory Decisions,* 65 Temple L.Rev., 425, 454–58 (1992) (listing 50 examples); *see also,* A. Mikva & Bleich, *When Congress Overrules the Court,* 79 Cal L.Rev. 729 (1991) (providing an historical overview).

The Court has read and re-read *Duro* and is convinced that it is not a constitutional decision, but rather, like its two predecessors, *Oliphant* and *Wheeler,* is a decision based on federal common law. Although *Duro* is replete with references to sovereignty—a word that has constitutional implications—the decision does not rest on any constitutional provision.

---

**2.** *Enas* overruled *Means v. Northern Cheyenne Tribal Court,* 154 F.3d 941 (9th Cir.1998) insofar as it held that Congress did not have the power to decide whether Indian tribes have

always had and retained the inherent authority to exercise criminal jurisdiction over non-member Indians. 255 F.3d 662, 2001 WL 726669 at *7, n. 8.

*Enas*, 255 F.3d at 673–74. Nor does *Duro* state or even intimate that its holding is compelled by or rooted in any constitutional precepts. *Id.* If *Duro* and its progeny, *Oliphant* and *Wheeler*, had constitutional dimensions which constrain Congress's legislative authority, it is not readily apparent from the opinions themselves.[3] Surely if these decisions were constitutionally based, the Supreme Court would have said so or at least mentioned the Constitution in its writings. *Id.*

Nor is *Duro* a statutory construction case. Although the Supreme Court in *Duro* did refer to several statutes in the course of its jurisdictional analysis, *see e.g.*, 495 U.S. at 691, 110 S.Ct. 2053, it was not called upon and did not have to interpret any particular statute.

This case, unlike most others, involves a dispute between the judicial and legislative branches of government, not over a constitutional or statutory issue, but rather, a matter of common law based on history. Accepting, as the Court does, that the sovereignty issue decided in *Duro* was a matter of federal common law, *see Enas*, 255 F.3d at 674–75, *Weaselhead*, 156 F.3d at 825, (M.S.Arnold, J., dissenting), who then holds the trump card? The answer is clear: within the realm of federal common law—and the federal common law of Indian tribes—Congress is supreme. 255 F.3d at 674–75 (*citing Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). Accordingly, Congress had the authority and acted within its bounds when it passed into law the 1990 amendments to the ICRA.

As the above discussion indicates, had the Court concluded that the issue before it was one involving constitutional history, its recommendation to the District Court would most certainly be different. Indeed, there can be little doubt that a disgruntled Congress may not overrule, expressly or by the implication, a constitutional decision by retroactively modifying, through "clarifying legislation", the history upon which it is based. *Id.* For the reasons already discussed, this is not the situation present here.

## VIII.

[¶ 30] This Court concludes that (1) the CRST proceeded under its inherent sovereignty, not under one that Congress delegated, in exercising jurisdiction over Archambault and (2) under the dual sovereignty doctrine, the government was not barred by the Double Jeopardy Clause from prosecuting him, following his tribal convictions, for assault in federal court.[4]

## IX.

[¶ 31] Archambault alternatively claims that 18 U.S.C. § 1153 and 25 U.S.C. §§ 1301–03 deny him due process and equal protection under the law. He argues that these statutory provisions are discriminatory because they "place nonmember Indians in jeopardy of tribal criminal prosecution and subsequent federal prosecution for the same act." Docket No.

---

3. *Accord*, F. Pommersheim, *"Our Federalism" in the Context of Federal Courts and Tribal Courts: An Open Letter to the Federal Courts' Teaching and Scholarly Community*, 71 U.Colo.L.Rev. 123, 177–78 (2000); L. Gould, *The Consent Paradigm: Tribal Sovereignty at the Millenium*, 96 Colum.L.Rev., 809, 853 (1996).

4. This conclusion is consistent with the Eighth Circuit's *en banc* decision in *Weaselhead*. 165 F.3d at 1209. More importantly, the *Weaselhead* court's affirmance, *en banc*, of the district court's order itself provides an adequate and independent basis for denial of Archambault's Dismissal Motion and the Court adopts and relies on such a rationale as a secondary ground for making its recommendation herein.

30 at 8. Archambault maintains the two sets of statutes "unreasonably and intentionally employ[ ] a racial classification that imposes a severe burden upon non-member Indians by granting dual prosecution in both tribal and federal courts while not granting the same jurisdiction [to] non-Indians." Docket No. 27 at 3.

[¶ 32] Archambault's Fifth Amendment claims, however, have been addressed and rejected by the Supreme Court and other courts and therefore are wholly without merit. *See United States v. Antelope*, 430 U.S. 641, 642–50, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *Fisher v. District Court*, 424 U.S. 382, 390–91, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Morton*, 417 U.S. at 551–55, 94 S.Ct. 2474; *see also, United States v. Eagleboy*, 200 F.3d 1137, 1138–40 (8th Cir. 1999); *United States v. Juvenile Male*, 864 F.2d 641, 645–46 (9th Cir.1988); *Kills Crow v. United States*, 451 F.2d 323, 325–27 (8th Cir.1971), *cert. denied*, 405 U.S. 999, 92 S.Ct. 1262, 31 L.Ed.2d 467 (1972); *United States v. Banks*, 368 F.Supp. 1245, 1248 (D.S.D.1973).

## X.

[¶ 33] Finally, Archambault contends that 25 U.S.C. § 1301 is an unconstitutional bill of attainer. Docket No. 30 at 7. At oral argument, he conceded though, that his bill or attainer contention was tied to and dependent on his due process and equal protection claims. H.Tr. 2–3. As already demonstrated, these claims are not cognizable. This being the case, Archambault's contention, that § 1301 violates the ban on bills of attainer, must likewise fall by the wayside.

[¶ 34] The contention must fail for yet another reason as well. Simply stated, § 1301 is not a bill of attainer under Article I, § 9 of the Constitution.

[¶ 35] A bill of attainer is a law that legislatively determines guilt and inflicts punishment upon named individuals, *see e.g., United States v. Lovett*, 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), or readily identifiable groups, *see e.g., Ex parte Garland*, 71 U.S. (4 Wall) 333, 18 L.Ed. 366 (1866), "without provision of the protections of a judicial trial." *Selective Service System v. Minn. Public Interest Research Group*, 468 U.S. 841, 846–47, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984); *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *see also Planned Parenthood of Mid–Missouri v. Dempsey*, 167 F.3d 458, 465 (8th Cir.1999). In passing a bill of attainer, Congress departs from its constitutional role of providing general rules for the government of society and usurps the judicial role by determinating guilt legislatively. *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810). The danger of such a law is, of course, that it deprives the accused of the protections afforded by judicial process.

[¶ 36] Archambault is not the victim of a bill of attainer. Section 1301, a four-term definitions statute, does not punish Archambault without an adjudication of guilt. *Selective Service*, 468 U.S. at 852–53, 104 S.Ct. 3348; *United States v. Van Horn*, 798 F.2d 1166, 1168 (8th Cir.1986). Nor is the statute intended to further a punitive purpose or otherwise codify a desire, on the part of Congress, to punish non-member Indians like Archambault. *Selective Service*, 468 U.S. at 853–56, 104 S.Ct. 3348; *Planned Parenthood*, 167 F.3d at 465. The statute therefore easily passes constitutional muster and provides Archambault with no grounds whatsoever for dismissal of his case.

## XI.

[¶ 37] Based on the foregoing and in accordance with 28 U.S.C. § 636(b)(1), this Court hereby

[¶ 38] RECOMMENDS that Archambault's Motion for Dismissal, Docket No. 26, be denied in its entirety and with prejudice.

[¶ 39] Dated this 13th day of July, 2001, at Pierre, South Dakota.

### NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendations for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge.** *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72.

### SUPPLEMENTAL REPORT AND RECOMMENDATION FOR DISPOSITION OF DEFENDANT'S MOTION FOR DISMISSAL

#### I.

[¶ 1] On July 26, 2001, the District Court[1] remanded the instant case for further proceedings pursuant to 28 U.S.C. § 636(b)(1)(C). Docket No. 46. In its Remand Order, the District Court directed that this Court consider the case, and in particular, the Motion for Dismissal filed by defendant, James Archambault, also known as James Skunk (Archambault), in light of the United States Supreme Court's recent decision in *Nevada v. Hicks*, —— U.S. ——, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). The District Court also directed that Archambault be afforded the opportunity to offer additional evidence purporting to show a "dependent relationship" between the Cheyenne River Sioux Tribe, its tribal court and law enforcement, and plaintiff, United States of America (government). In accordance with the District Court's directives, this Court has permitted the parties to brief and argue the *Hicks* case and has allowed both Archambault and the government to supplement the record with additional or rebuttal evidence.

#### II.

[¶ 2] This Court has carefully reviewed *Hicks,* including the various concurring opinions thereof, and believes that it does not control the double jeopardy claim raised by Archambault in his Motion and that the Court's reasoning and analysis with respect to this claim, set forth at pages 2–9, ¶¶ III–VIII of the Report and Recommendation, Docket No. 35, should be reaffirmed,[2] with one exception.[3]

[¶ 3] In *Hicks,* the United States Supreme held that a Nevada tribal court did not have jurisdiction over civil claims against state officials who entered tribal land to execute a search warrant against a tribal member suspected of having violated state law while off the reservation. 533 U.S. at —— —— ——, 121 S.Ct. at 2309–13. Applying the all too familiar principles of

---

**1.** The Honorable Charles B. Kornmann, United States District Judge, presiding.

**2.** *Hicks* does not appear to involve or otherwise deal with Archambault's due process, equal protection and bill of attainer claims and the Court's discussion of these issues, found at pages 1022–23, ¶¶ IX–X of the Report and Recommendation, is likewise reaffirmed.

**3.** Footnote 4 on page 1022 of the Report and Recommendation should be modified to reflect that the conclusion reached in the Report on the double jeopardy issue coincides with the district court's decision in *United States v. Weaselhead,* 36 F.Supp.2d 908 (D.Neb.1997), *aff'd by an equally divided court,* 165 F.3d 1209 (8th Cir.) (*en banc* ), *cert. denied,* 528 U.S. 829, 120 S.Ct. 82, 145 L.Ed.2d 70 (1999), and the Court adopts and relies on the rationale of that court in making its recommendation on this issue.

*Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court determined, among other things, that:

> (1) tribal authority to regulate state officers executing process relating to state offenses that occurred off the reservation was not essential to tribal self-government or internal relations—to "the right to make laws and be ruled by them"; and
>
> (2) Congress did not strip states of their inherent jurisdiction on reservations with regard to off-reservation violations of state criminal laws.

*Id.* at 2313. *Hicks* did not address, much less resolve, the ultimate source of authority by which tribal courts exercise jurisdiction over nonmember Indians who commit crimes while on the reservation or whether the government, by virtue of the Double Jeopardy Clause, is barred from prosecuting a nonmember Indian, following his tribal convictions, for an equivalent offense in federal court. Instead, the Court's holding was "limited to the question of tribal-court jurisdiction over state officers enforcing state law", and explicitly left "open the question of tribal-court jurisdiction over nonmember defendants in general". *Id.* at 2309 n. 2; *see also, id.* at 2319 (Souter, J. concurring); *id.* at 2324 (Ginsburg, J. concurring).

[¶ 4] In addition to *Hicks,* the Court has read and considered *Atkinson Trading Co.*

*v. Shirley,* 532 U.S. 645, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001), a recent case cited to by the *Hicks* Court. In *Atkinson,* the Supreme Court, applying the *Montana* framework, held that an Indian tribe lacked authority to impose a hotel occupancy tax upon nonmember guests for activity that occurred on non-Indian fee land located within reservation boundaries. 121 S.Ct. at 1832–35. In doing so, the Court found that the tribe failed to establish that the occupancy tax was commensurately related to any consensual relationship or necessary to vindicate the political integrity, economic security, health or welfare of the tribe and therefore was unlawful. *Id.* at 1834–35. *Atkinson,* like *Hicks,* did not broach, much less decide, the dual sovereignty/double jeopardy issue which is the gravamen of Archambault's Dismissal Motion.

[¶ 5] Inasmuch as *Hicks* and *Atkinson* are factually and legally distinguishable from the case at hand, they do not govern, much less change, the Court's earlier Report and Recommendation.

### III.

[¶ 6] Yet, insofar as these cases are precedentially instructive, they do not detract from or otherwise weaken, the Court's prior conclusion that the government is not precluded, by the Double Jeopardy Clause, from going forward with its prosecution against Archambault.[4]

---

4. As is suggested in its original Report and Recommendation, this Court believes that the panel decision in *United States v. Weaselhead,* 156 F.3d 818 (8th Cir.1998) was wrongly decided. At least one other court and several commentators, who have reviewed the case, agree. *See United States v. Enas,* 255 F.3d 662, 674–75 (9th Cir.2001) (*en banc*); Frank Pommersheim, *"Our Federalism" in the Context of Federal Courts and Tribal Courts: An Open Letter to the Federal Courts' Teaching and Scholarly Community,* 71 U.Colo.L.Rev. 123, 175–79 (2000); Nancy Thorington, *Civil*

*and Criminal Jurisdiction Over Matters Arising in Indian Country: A Roadmap for Improving Interactions Among Tribal, State and Federal Governments,* 31 McGeorge L.Rev. 973, 1000–01 (2000); Christopher B. Chaney, *The Effect of the United States Supreme Court's Decisions During the Last Quarter of the Nineteenth Century on Tribal Jurisdiction,* 14 BYU J.Pub.L. 173, 179–80 (2000); Philip P. Frickey, *A Common Law For Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority Over Nonmembers,* 109 Yale L.J. 1, 85 n. 322

[¶ 7] *Montana* recognizes that a tribe may retain inherent power to exercise jurisdiction over a nonmember when his conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566, 101 S.Ct. 1245. These interests are plainly implicated where, as here, a nonmember Indian engages in violent criminal activity within the boundaries of a tribe's own reservation.[5] Without question, the apprehension, prosecution and punishment of such an offender are essential attributes of tribal sovereignty and necessary, if not crucial, to protect the health and safety of tribal members. Indeed, a tribe's authority to prosecute violent domestic crimes, committed by nonmember Indians against its own members while on the reservation, has always been an inherent facet of tribal self-government and an integral part of the tribe's sovereign duty to "preserve and protect" its people and the homeland. *See Enas*, 255 F.3d at 664–65, 675 (holding that a tribe had the inherent authority to prosecute a nonmember Indian for assaulting a tribal member while on the reservation

and that federal assault charges, stemming from the same incident and filed after the nonmember's tribal assault conviction, were based on a separate power source and therefore did not violate the Double Jeopardy Clause); 25 U.S.C. § 1301(2) (expanding the definition of "powers of self government" and, in the process, recognizing and affirming "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over all Indians");[6] *see also, Mousseaux v. United States*, 806 F.Supp. 1433, 1441–43 (D.S.D.1992), *aff'd in part and remanded in part on other grounds*, 28 F.3d 786 (8th Cir.1994).

[¶ 8] The Supreme Court in *Montana* and other cases also recognized that tribes retain sovereign interests in activities that occur on land owned and controlled by a tribe, especially when these interests involve violations of tribal law and injuries to the tribe's own members in a domestic relations setting.[7] *Hicks*, 533 U.S. at ——, ——, 121 S.Ct. at 2310, 2316 (acknowledging that tribal ownership is a significant factor in the *Montana* analysis that may be dispositive unless outweighed by

---

(1999); *see also*, Note, *Dispelling The Constitutional Creation Myth of Tribal Sovereignty, United States v. Weaselhead*, 78 Neb.L.Rev. 162, 180–204 (1999).

5. Copies of the relevant FBI 302's, tribal offense reports and other materials detailing Archambault's alleged criminal conduct, are found in the record. *See* Docket No. 70. The record also indicates that Marie DeWitt, the victim in the tribal Domestic Violence offense Archambault was convicted of, is an enrolled member of the Cheyenne River Sioux Tribe (CRST). Docket No. 87. DeWitt is the alleged victim in the instant case (which, of course, arises out of and is based on the Domestic Violence charge Archambault pled guilty to in tribal court on October 19, 2000). *See* Docket Nos. 27 (Ex. A), 70.

6. Congress, at the same time, added a definition of the term "Indian" devoid of any requirement of tribal membership within the

tribe exercising criminal jurisdiction. *See* 25 U.S.C. § 1301(4).

7. At the time of the charged offense, Archambault and DeWitt lived together as "husband and wife" in tribal housing they shared with their three children. Docket No. 70. The house they lived in is located in Timber Lake, South Dakota and is where Archambault allegedly assaulted DeWitt. *Id.* In addition, the parties stipulated that this is a criminal domestic relations case. H.Tr. (Sept. 5, 2001) 67–68. These facts are important because CRST's sovereign powers are much stronger in domestic relations matters involving a tribal member who, while living in a home provided to her by the tribe, is severely beaten by her nonmember Indian "husband". *See Montana*, 450 U.S. at 564, 101 S.Ct. 1245 (tribes have inherent authority to punish tribal offenders and to regulate domestic relations among members).

other interests); *Strate v. A–1 Contractors,* 520 U.S. 438, 454–55, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (agreeing "that tribes retain considerable control over nonmember conduct on tribal land" but concluding that because the defendant's alleged tortious conduct occurred on land that was equivalent to "alienated non-Indian land" tribal court jurisdiction was lacking); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 142, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (tribe has taxing authority over tribal lands leased by nonmembers); *Montana,* 450 U.S. at 557, 101 S.Ct. 1245 (a tribe may prohibit or regulate the activities of nonmembers on land belonging to the tribe or held by the United States in trust for the tribe); *see also, Atkinson,* 121 S.Ct. at 1831–32 (a tribe's inherent power to tax does not extend to nonmember activity occurring on non-Indian fee land). A tribe's authority to punish Indian nonmembers for criminal conduct perpetrated against *tribal members on*

*tribal property* is essential to tribal self-government and/or internal relations given the multitude of nonmember Indians who live on reservations and the number and frequency of crimes that occur in this context each day.[8] *See and compare Hicks,* 533 U.S. at ——, 121 S.Ct. at 2316 (tribal self-government and internal relations are not threatened or otherwise affected by "a narrow category of outsiders"); *Atkinson,* 121 S.Ct. at 1834–35 (operation of a hotel on non-Indian fee land did not endanger the tribe's political integrity).

[¶ 9] Although the Supreme Court in *Duro,* temporarily limited the reach of tribal authority over nonmember Indians in criminal cases, Congress, acting pursuant to its plenary power under the Indian Commerce Clause,[9] quickly rejected the Court's holding when it amended the Indian Civil Rights Act (ICRA) on October 24, 1990, to acknowledge, confirm and prospectively restore the inherent authority of Indian tribes over *all* Indians,[10] including

---

**8.** *See* Allison M. Dussias, *Geographically–Based and Membership–Based Views of Tribal Sovereignty: The Supreme Court's Changing Vision,* 55 U.Pitt.L.Rev. 1, 97 n. 155 (1993) (pointing out, with citation to authorities, that the number of nonmember Indians who live on reservations and commit crimes there is substantial); *see also,* Docket No. 85 (June 11, 1990 Memorandum) (referring to the *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990) decision as being "problematic" because of the fact that many reservations have "populations" of nonmember Indians).

**9.** *See* U.S. Const. art. I, § 8, cl. 3.

**10.** The 1990 amendments were designed by Congress to override *Duro* in at least two respects. First, tribes now have criminal jurisdiction over nonmember Indians. Second, and perhaps more importantly, Congress intended to replace *Duro's* historical perspective, in which tribes had no power over nonmember Indians, with a different version that "recognized and affirmed" such power to be "inherent" and consistent with "two hundred years of Federal law". *See* 136 Cong.Rec.

H13556–01, *H13596 (Oct. 24, 1990), 1990 WL 206923; *see also* 137 Cong.Rec. H8131–06, *H8132 (Oct. 22, 1991), 1991 WL 212368 (reaffirming that Congress determines Indian policy); Indian tribes retain all rights and powers not expressly divested by Congress; and that these principles go back to the decisions of Chief Justice John Marshall and are part of the foundation of the federal tribal relation. *See Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832)); 137 Cong.Rec. 55167–01, * * 55223–24 April 25, 1991), 1991 WL 65008 (stating that the assumption in Congress has always been that tribal governments do have such jurisdiction, and federal statutes reflect this "view" and that the amendments were intended to "recognize and reaffirm" the inherent authority of tribal governments to "exercise criminal jurisdiction over all Indians"); 137 Cong.Rec.H. 2988–02, *H2990 (May 14, 1991), 1991 WL 77806 (report on H.R. 972) (stating that the amendments "seek to assure Indian tribes of their jurisdiction over misdemeanor crimes committed on their lands by Indians who are not members of their tribe. The Committee is clarifying an inherent right which tribal gov-

nonmembers.[11] It is beyond dispute that Congress is empowered to "deal with the special problems [facing] Indians" and to "legislate on [their] behalf, using its authority under the Indian Commerce Clause". *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *see also, Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) ("the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs"). More importantly, Congress has the power to alter inherent sovereignty that Indian tribes possess because it has legislative authority over federal common law. *Enas,* 255 F.3d at 673–75; *see also, Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 313–14, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("federal common law is 'subject to the paramount authority of Congress' "); *Washington v. Confederated Bands & Tribes of Yakima Nation,* 439 U.S. 463, 501, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) ("[i]t is well established that Congress, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereignty of the Indian tribes").[12] Congress can also *recognize* tribal authority without being the *source* of that authority. *See United States v. Wheeler,* 435 U.S. 313, 328, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

[¶ 10] Here, the CRST prosecuted Archambault pursuant to its own inherent authority. As discussed in the Court's initial Report and Recommendation, the

---

ernments have always held and was never questioned . . . ".).

Congress likewise made clear that the amendments were not a congressional delegation of authority, but rather a recognition of power that had always existed, i.e., an inherent power that had never been extinguished. *See* 137 Cong.Rec. H8131–06, *H8132, 1991 WL 212368 (noting that the amendments are not a delegation of criminal jurisdiction to Indian tribes); 137 Cong.Rec. H2988–02, *H2991, 1991 WL 77806 ("tribes have retained the criminal jurisdiction over nonmember Indians and this legislation is not a federal delegation of this jurisdiction but a clarification of the status of tribes as domestic dependent nations"); 137 Cong.Rec. E2165–04, *E2166, (June 12, 1991), 1991 WL 100975 (statement of Rep. Miller) ("we make these corrections to make clear the Committee's acknowledgment of the fact that tribes—first have always been able to exercise misdemeanor criminal jurisdiction over all Indians on tribal lands; second, that Congress never took the jurisdiction away; and third, that tribes clearly retain this jurisdiction as self-governing entities and as keepers of the peace on their homelands.").

11. Although the issue is still open to debate, several commentators have persuasively argued that the amendments serve to reinvest tribes with criminal jurisdiction over nonmember Indians. *See e.g.,* L. Scott Gould, *The Congressional Response to Duro v. Reina: Compromising Sovereignty and the Constitution,* 28 U.C. David L.Rev. 79–80 (1994) ("the fate of [the amendments] may turn on whether the Court accepts the law as recognition of inherent sovereignty or, instead, views it as a delegation of authority. If the former, the Court must step aside because a clear statement of congressional intent displaces federal common law"); Nell Jessup Newton, *Permanent Legislation to Correct Duro v. Reina,* 17 Am. Indian L.Rev. 109, 113 (1992) ("[i]f the [Supreme] Court errs in determining congressional intent, Congress can correct the court"); Philip S. Deloria and Nell Jessup Newton, *The Criminal Jurisdiction of Tribal Courts Over Non-Member Indians,* 38 Fed. Bar New & J. 70, 75 (Mar.1991) ("where Congress is merely recognizing a power that Indian tribes have, *a priori,* that from time immemorial, we believe the Court should . . . defer").

Some commentators have even suggested that the amendments raise due process and equal protection issues if the same are viewed as a delegation of federal power. *See e.g., Gould,* 28 U.C. Davis L.Rev. at 94–121; Alex Tallchief Skibine, *Duro v. Reina, and the Legislation That Overturned It: A Power Play of Constitutional Dimensions,* 66 S.Cal.L.Rev. 767, 784–805 (1993).

12. *C.f.* Pommersheim, 71 U.Colo.L.Rev. at 177–79.

dual sovereignty doctrine allows two independent sovereigns to prosecute a law-breaker separately for the same conduct without offending the Double Jeopardy Clause. *See Heath v. Alabama,* 474 U.S. 82, 88–91, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *Wheeler,* 435 U.S. at 316–32, 98 S.Ct. 1079; *see also, United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922) ("an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each"). Because the Tribe and the federal government are separate sovereigns for double jeopardy purposes, the dual sovereignty doctrine permits successive tribal and federal prosecutions of Archambault for the domestic violence/assault offenses. *Enas,* 255 F.3d at 664–75; *see also, id.* at 682–83 (Pregerson, J. concurring).

### IV.

[¶ 11] This result is consistent with Congress's intent when it enacted the 1990 amendments. Legislative history of these amendments evinces a clear desire on the part of Congress for § 1301 to serve as confirmation of the tribe's pre-existing jurisdiction and not as a delegation of the same. Recognizing the inherent sovereignty of CRST gives full effect to and carries out this congressional intent.

[¶ 12] Such a reading of the 1990 amendments is also consistent with other provisions of the ICRA. For example, under the ICRA, tribal courts have limited criminal jurisdiction and can only sentence criminal defendants to one year of imprisonment, a $5,000 fine, or both. *See* 25 U.S.C. § 1302(7). If the 1990 amendments were interpreted as an affirmative delegation of power to tribal courts, then the Double Jeopardy Clause would only permit defendants to be prosecuted once. In such a case, a nonmember Indian who brutally murders his tribal member girlfriend while on reservation property could race into tribal court, plead guilty and be sentenced as a misdemeanant, and avoid federal prosecution. By the same token, a tribal member, who commits the same crime would not be shielded by the Double Jeopardy Clause and could be prosecuted by tribal and federal authorities and sentenced much more harshly. It is questionable whether Congress really intended for this to happen. *See Wheeler,* 435 U.S. at 331, 98 S.Ct. 1079 (stating that "[w]ere the tribal prosecution held to bar the federal one, important federal interests in the prosecution of major offenses on Indian reservations would be frustrated").

[¶ 13] Finally, the result reached herein is consistent with federal criminal statutes relating to Indians. The Federal Enclaves Act (also known as the General Crimes Act), codified at 18 U.S.C. § 1152, assumes that tribes have the power to punish any Indian, member or nonmember. Significantly, the Act expressly excludes from its reach "*any Indian* committing any offense in the Indian country who has been punished by the local law of the tribe." (emphasis added). The Major Crimes Act, 18 U.S.C. § 1153, likewise makes no distinction between member and nonmember Indians. This Act gives federal courts jurisdiction over certain enumerated crimes committed by "*[a]ny Indian* in Indian country." *Id.* (emphasis added). Based on this language, the Act has routinely been applied to all Indians without regard to tribal membership status. *See* William C. Canby, Jr., *American Indian Law,* 125–27 (3d ed.1998).

[¶ 14] After *Duro,* Congress exercised its power under the Indian Commerce Clause and enacted the 1990 amendments, clearly intending to restore inherent jurisdiction of Indian tribes over all Indians. *See Mancari,* 417 U.S. at 553–55, 94 S.Ct.

2474 (standard for determining whether statute was an appropriate exercise of Indian Commerce Clause authority was whether it was "tied rationally to the fulfillment of Congress's unique obligation toward the Indians"). Construing these amendments as recognizing and confirming the inherent authority of tribes to exercise criminal jurisdiction over nonmember Indians fulfills the express desires of Congress and is in accord with constitutional strictures.

## V.

[¶ 15] By way of an offer of proof, supported by live testimony and documents obtained from the Bureau of Indian Affairs (BIA), Archambault contends:

1. That because CRST is dependent upon the government for the funding and resources necessary to maintain the Tribe's law enforcement program and court system, the government is able to exercise broad authority over tribal operations and affect, among other things, how offenses perpetrated within the Tribe's borders are investigated, prosecuted and disposed of;

2. That prior to August 6, 1948, CRST had no authority over nonmember Indians who committed crimes on the reservation; and

3. That whatever jurisdiction CRST had over nonmember Indian offenders after that date and up to the time the 1990 amendments were passed, sprung from authority delegated to it by the BIA.

Docket Nos. 45, 85, 88.

[¶ 16] The question, however, is not whether the government's assistance, in some form or manner, tainted the sovereign independence of CRST, or what authority (inherent, delegated or both) the Tribe may have had over nonmember Indians *in the past.*[13] Rather, the critical issue is whether the Tribe acted through its inherent authority or that delegated to it by Congress when it prosecuted Archambault *in 2000. Wheeler,* 435 U.S. at 322, 98 S.Ct. 1079; *Enas,* 255 F.3d at 664, 666–75. Stated another way, is Archambault being proceeded against now by the

---

**13.** Tribal power need not have historical roots to be "inherent". A tribe's inherent powers come from those powers historically recognized as inherent *and* from those powers that Congress, through legislation enacted under the Indian Commerce Clause, recognizes as inherent to tribal sovereignty. Thus, when a territory of the United States, which has no inherent power, prosecutes criminal offenders, it does so pursuant to delegated power from the government, and the Double Jeopardy Clause prohibits successive prosecutions. *People of Puerto Rico v. Shell Co.,* 302 U.S. 253, 264–65, 58 S.Ct. 167, 82 L.Ed. 235 (1937). Yet when Congress passes enabling legislation admitting that territory to statehood, the new state becomes clothed with inherent authority and can act in its own sovereign capacity. *See generally, Bartkus v. Illinois,* 359 U.S. 121, 123–39, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). In this situation, the dual sovereignty doctrine permits successive prosecutions by both the state and the govern-

ment. *Abbate v. United States,* 359 U.S. 187, 193–94, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *see also, Enas,* 255 F.3d at 679–80, n. 4 (Pregerson, J. concurring).

> Similarly, newly recognized tribes may not have historically had any independent sovereign powers whatsoever. By formally recognizing these tribes, Congress has "enabled" them with inherent sovereign authority. This authority is deemed "inherent", even if the same did not exist in the past, because the tribes, by virtue of their congressional recognition, are now able to act as sovereign entities. *Enas,* 255 F.3d at 682, n. 8 (Pregerson, J. concurring).
>
> The same rule should likewise apply to the case at hand. The Court sees no compelling reason why CRST's prosecutorial authority over Archambault should not be considered "inherent" because the Tribe may have exercised authority delegated to it by the Department of Interior before October, 1990. *Id.*

same or a separate sovereign as the one that prosecuted him in tribal court last year? These questions are legal, not factual ones and turn on whether Congress had the power to determine, as a matter of federal common law, that tribal criminal jurisdiction over nonmember Indians was inherent. Because of the obvious tension between *Duro* and the 1990 amendments, complex and subtle issues of constitutional law exist, particularly in the area of separation of powers. Even so, the Court remains convinced that the inherent sovereignty of tribes is a matter of federal common law which Congress had the legislative authority to alter under the Indian Commerce Clause.[14] In the Court's view, Congress "had the power to do exactly what it intended when it enacted the 1990 amendments...." *Enas*, 255 F.3d at 675. Inasmuch as the Tribe was acting pursuant to its inherent authority when it prosecuted *Enas*, the tribal and federal prosecutions were undertaken by

separate sovereigns and did not violate the Double Jeopardy Clause.[15] *Id.*

## VI.

[¶ 17] For the reasons stated herein and that were articulated previously in the Court's July 13, 2001 Report and Recommendation, it is accordingly again

[¶ 18] **RECOMMENDED** that Archambault's Motion for Dismissal, Docket No. 26, be DENIED in its entirety and with prejudice.

[¶ 19] Dated this 12th day of September, 2001 at Pierre, South Dakota.

## NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendation for Disposition within ten (10) days from the date of service shall bar an aggrieved party from at-**

---

**14.** As one commentator has observed, "[The Supreme Court's] holdings in *Oliphant* [*v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) ] and *Duro* are not rules of constitutional law, but of federal common law, adopted in the absence of express congressional intent. Because Congress retains control of Indian policy, the Court must respect any 'appropriate legislation' which corrects the Court's judgment, lest it exceed its Article III authority. [The 1990 amendments are] intended as just such an expression of congressional policy". *Gould,* 28 U.C. Davis L.Rev. at 79.

**15.** It should be noted that Archambault's first contention, relating to the level of influence the government exerts over CRST, must fail because he has not affirmatively shown that, because of the government's "presence" in law enforcement, the court system and tribal affairs in general, the Tribe is in reality an "arm" of the government, *see Wheeler*, 435 U.S. at 328, 98 S.Ct. 1079, and not a distinctly sovereign entity. Nor has he shown whether any of the assistance the Tribe received from the government was utilized in connection with crimes committed by nonmember

Indians, and if it was, whether the assistance was substantial or *de minimus.* If most of the assistance that was provided to the court system and to law enforcement was used for criminal matters involving the Tribe's own members, Archambault's double jeopardy contention must fall by the wayside. *See Wheeler*, 435 U.S. at 322–30, 98 S.Ct. 1079.

Aside from this, there is another, more pragmatic reason why Archambault's "government influence" contention cannot succeed. If accepted and carried to its logical conclusion, such a contention would effectively "federalize" almost every aspect and function of tribal government, gutting tribes, like CRST, of their sovereign status. More importantly, the contention fails to consider the fact that *all* other governmental entities—state, county and municipal— also receive federal funding. Does this mean, then, that a state court system (or for that matter a law enforcement, social services, transportation or other state agency) which receives federal monies is a *de facto* subsidiary of the government and therefore only exercises delegated authority? Of course not.

tacking such Report and Recommendation before the assigned United States District Judge. *See* 28 U.S.C. § 636(b)(1).