UNITED STATES of America, Plaintiff,

v.

Robert Lee WEASELHEAD,
Jr., Defendant.

No. 8:97CR45.

United States District Court,
D. Nebraska.

Dec. 4, 1997.

Michael P. Norris, Assistant U.S. Attorney, Omaha, NE, for Plaintiff.

David R. Stickkman, Federal Public Defender, Omaha, NE, for Defendant.

## ORDER

SHANAHAN, District Judge.

Before the court are (1) filing no. 10, the "Motion to Dismiss Indictment and Request for Evidentiary Hearing and Oral Argument," filed by the defendant, Robert Lee Weaselhead, Jr.; (2) filing no. 24, the "Amended Motion to Dismiss Indictment and Request for Evidentiary Hearing and Oral Argument," filed by the defendant, Robert Lee Weaselhead, Jr.; (3) filing no. 26, the "Motion to Suppress Statements and Request for Oral Argument and Evidentiary Hearing," filed by the defendant, Robert Lee Weaselhead, Jr.; (4) filing no. 32, the "Report and Recommendation" of Magistrate Judge Thomas D. Thalken; and (5) filing no. 33, the "Objections to the Report and Recommendation of Magistrate Judge Thomas D. Thalken," filed by the plaintiff, the United States of America.

In filing no. 32, Magistrate Judge Thomas D. Thalken recommends that the "Amended Motion to Dismiss Indictment and Request for Evidentiary Hearing and Oral Argument" (filing no. 24), filed by the defendant, Robert Lee Weaselhead, Jr., be granted, and the "Motion to Suppress Statements and Request for Oral Argument and Evidentiary Hearing" (filing no. 26), filed by the defendant, Robert Lee Weaselhead, Jr., be denied.

No objections have been made with respect to Magistrate Judge Thomas D. Thalken's recommendation that the "Motion to Suppress Statements and Request for Oral Argument and Evidentiary Hearing" (Filing no. 26), filed by Robert Lee Weaselhead, Jr., be denied. (filing no. 32). Notwithstanding the absence of any objection, the court, pursuant to NELR 72.4 and 28 U.S.C. § 636(b)(1)(C), has conducted an independent and de novo review of the record. The court accepts Magistrate Judge Thomas D. Thalken's "Report and Recommendation" (filing no. 32), with respect to Magistrate Judge Thomas D. Thalken's recommendation that the "Motion to Suppress Statements and Request for Oral Argument and Evidentiary Hearing" (Filing no. 26), filed by the defendant, Robert Lee Weaselhead, Jr., be denied.

The plaintiff, the United States of America has filed objections to the portion of Magistrate Judge Thomas D. Thalken's recommendation that the "Amended Motion to Dismiss Indictment and Request for Evidentiary Hearing and Oral Argument" (filing no. 24), filed by the defendant, Robert Lee Weaselhead, Jr. be granted. Pursuant to 28 U.S.C. § 636(b)(1)(C) and NELR 72.4, this court makes a "de novo determination of those portions of the report . . . or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C) ("[w]hether a magistrate's report and recommendation is correct").

## BACKGROUND

Robert Lee Weaselhead, Jr. (Weaselhead), is an enrolled member of the Blackfoot Indian Tribe of Montana. On March 20, 1997, Winnebago tribal police arrested Weaselhead for sexually assaulting a minor on the Winnebago Indian Reservation. On March 20, 1997 in the Winnebago Tribal Court, Weaselhead entered a plea of "no contest" to the charge of first degree sexual assault.

In exchange for Weaselhead's plea of "no contest," Winnebago Tribal prosecutors agreed to dismiss all other pending charges against Weaselhead including: (1) contributing to the delinquency of a minor; (2) child abuse; and (3) criminal trespass. An implicit understanding existed between tribal prosecutors and Weaselhead that the plea agreement encompassed not only charged conduct, but also, uncharged sexual misconduct conduct that allegedly occurred on February 27, 1997 and March 1, 1997. On March 20, 1997, the Winnebago Tribal Court accepted Weaselhead's plea and sentenced Weaselhead for his conviction of the March 15, 1997 sexual assault of a minor.

On March 20, 1997, a federal grand jury returned a single count indictment charging Weaselhead with engaging in sexual relations with a minor in violation of 18 U.S.C. §§ 2243 and 1153. Subsequently, on June 17, 1997, a federal grand jury returned a superseding three-count indictment charging Weaselhead with engaging in sexual relations with a minor [1] in contravention of 18 U.S.C. §§ 2243 and 1153. Count III of the "Superseding Indictment" (filing no. 18) has its genesis in the same conduct which was the basis of Weaselhead's no contest plea and conviction in the Winnebago Tribal Court. Counts I and II of the "Superseding Indictment" relate to sexual misconduct conduct that allegedly occurred on February 27, 1997 and March 1, 1997.

In response to the Indictment (filing no. 1), Weaselhead filed a "Motion to Dismiss [the] Indictment and Request for [an] Evidentiary Hearing and Oral Argument" (filing no. 10). Weaselhead subsequently filed an "Amended Motion to Dismiss [the] Indictment and Request for [an] Evidentiary Hearing and Oral Argument" (filing no. 24), in response to the Superseding Indictment (filing no. 18). In filing no. 24, Weaselhead alleges, *inter alia,* that (1) the subsequent federal prosecution of a nonmember Indian violates the Double Jeopardy Clause of the Fifth Amendment and (2) federal prosecutors are bound the March 20, 1997 plea agreement between Weaselhead and Winnebago tribal prosecutors.

## ANALYSIS

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. While the exact scope of this clause has resisted repeated efforts at definition, it is axiomatic that successive prosecutions for the same unlawful conduct initiated by separate sovereigns do not offend the Constitution. *United States v. Wheeler,* 435 U.S. 313, 316, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *See generally, Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (reaffirming the well-established principle that a federal prosecution does not bar a subsequent state prosecution of the same person for the same conduct); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (upholding successive state and federal prosecutions).

In *Heath v. Alabama,* 474 U.S. 82, 90, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), the Supreme Court explained the dual sovereignty doctrine as follows: "[T]he dual sovereignty doctrine is founded on the common law conception of crime as an offense against the sovereignty of the government. When a in a single act violates the peace and dignity of two sovereigns by breaking the laws of each, [the defendant] has committed two distinct offences." *See Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 2053, 135 L.Ed.2d 392 (1996) (reaffirming that successive prosecutions by separate sovereigns do not violate the Double Jeopardy Clause); *United States v. Williams,* 104 F.3d 213, 216 (8th Cir.1997).

Consequently, when the same act transgresses the laws of two sovereigns, "it cannot truly be averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which [the offender] is justly punishable." *Heath,* 474 U.S. at 88,

1. *See* filing no. 18 (charging Weaselhead with engaging in criminal sexual acts with an Indian female minor on the following dates: February 27, 1997 (Count 1), March 1, 1997 (Count II), and March 15, 1997 (Count III)).

106 S.Ct. 433, *quoting Moore v. Illinois,* 55 U.S. 13, 19, 14 How. 13, 14 L.Ed. 306 (1852); *United States v. Pena,* 67 F.3d 153, 155 (8th Cir.1995);

■ The "dual sovereignty" doctrine, however, is inapplicable, where nominally different prosecuting entities initiate successive prosecutions predicated on analogous conduct. *Wheeler,* 435 U.S. at 318, 98 S.Ct. 1079. The application of the dual sovereignty doctrine is, therefore, contingent upon the two prosecuting entities deriving their prosecutorial powers from independent sources of authority. *Heath,* 474 U.S. at 90, 106 S.Ct. 433; *People of Puerto Rico v. Shell Co.,* 302 U.S. 253, 264–66, 58 S.Ct. 167, 82 L.Ed. 235 (1937).

■ "The derivation of tribal prosecutorial authority has confounded courts and generated a torrent of conflicting commentary." *Negonsott v. Samuels,* 507 U.S. 99, 102, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (noting the existence of a complex patchwork of federal, state and tribal law governing criminal jurisdiction over offenses committed in "Indian country"). In 1978, the Supreme Court unanimously determined that the Double Jeopardy Clause of the Fifth Amendment did not preclude a successive federal prosecution of a tribal member defendant under the Major Crimes Act.[2] *Wheeler,* 435 U.S. at 326, 98 S.Ct. 1079. Underlying this determination was the recognition that Indian tribes constitute separate sovereigns for the purpose of the double jeopardy clause of the Fifth Amendment. *Wheeler,* 435 U.S. at 329–30, 98 S.Ct. 1079. The Supreme Court reasoned that the exercise of criminal authority over tribal members, rather than being derived by delegated federal authority, was an aspect of non-divested inherent tribal sovereignty. *Id.*

Sixteen days prior to the *Wheeler* decision, the Supreme Court issued *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). In *Oliphant,* the Supreme Court determined that Indian tribes could not exercise criminal jurisdiction over non-Indians in the absence of some affirmative congressionally delegated authority. *Oliphant v. Suquamish Tribe,* 435 U.S. 191, 210, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). The Supreme Court predicated the *Oliphant* decision, *inter alia,* on the recognition that the tribe's dependent statutes implicitly divested tribal authority over non-Indians.[3]

In *Duro v. Reina,* the Supreme Court extended the judicial divestiture of sovereignty enunciated in *Oliphant.* The Supreme Court examined affirmative legislative enactments and determined that Indian tribes do not have criminal jurisdiction over nonmember Indians. *Duro v. Reina,* 495 U.S. 676, 684, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). Although the Court acknowledged that the evidence of criminal jurisdiction over nonmembers is "somewhat less illuminating than in *Oliphant,*"[4] *Duro,* 495 U.S. at 688, 110 S.Ct. 2053, the Court reified the Oliphant decision by opining that tribal jurisdiction over nonmember Indians is inconsistent with a tribe's status as a dependent sovereign. *Duro,* 495 U.S. 676, 691, 110 S.Ct. 2053, 109 L.Ed.2d 693.

Thus, in matters involving a tribe's prosecutorial authority, the paradigm was completed: the autonomous powers retained by tribes included only those required for internal self-governance and in the absence of authority delegated by Congress, the sovereign rights of tribes to prosecute criminal offenses extended exclusively to tribal members. Congress responded to the *Duro* decision by adopting Public Law 102–137, 1991

---

**2.** Major Crimes Act, 18 U.S.C.A. § 1153 (1994) and 18 U.S.C. § 3242 (1994) (giving federal courts exclusive jurisdiction over certain crimes committed in Indian country by both Indians and non-Indians).

**3.** The Court reasoned that, upon a tribe's incorporation into the United States, certain aspects of sovereignty were necessarily constrained as incompatible with the overriding interests of the federal government.

**4.** Compare Comment, *Jurisdiction Over Nonmember Indians on Reservations,* 1980 ARIZ. S.L.J. 727, 740 (treaties suggest lack of jurisdiction over nonmembers), with Note, *Who is an Indian?: Duro v. Reina's Examination of Tribal Sovereignty and Criminal Jurisdiction over Nonmember Indians,* 1988 B.Y.U. L. REV. 161, 170–71 (treaties suggest retention of jurisdiction over nonmembers).

U.S.C.C.A.N. 105 Stat. 646 (codified at 25 U.S.C. § 1301(2), (4)) (Public Law 102–137).[5] *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 1409 n. 5, 137 L.Ed.2d 661 (1997). The operative provision of Public Law 102–137 contains a single sentence.[6] This sentence makes permanent the temporary legislation Congress passed in 1990[7] to reverse the effects of *Duro* and to affirm the inherent prosecutorial tribal authority over nonmember Indians. The temporary legislation, made permanent by Public Law 102–137, had amended the 1968 Indian Civil Rights Act (ICRA)[8] by incorporating a congressional statement concerning the sovereign rights of tribes,[9] and by adding a definition of Indians[10] for purposes of criminal jurisdiction.[11] Implicit within this temporary legislation is the recognition that Indian tribes possess inherent criminal jurisdiction over all Indians. The congressional expression of intent found Public Law 102–137 is enlightening:

> The Committee asserts that the Congressional power over Indian tribes allows this recognition of the inherent right of tribes to retain this jurisdiction and notes that two fundamental maxims of Indian law come into play in this legislation. First, as Justice Kennedy stated in the Duro decision. Congress determines Indian policy.

5. Act of October 28, 1991, Pub.L. No. 102–137, 1991 U.S.C.C.A.N. 105 Stat. 646 (codified at 25 U.S.C. § 1301(2), (4)) On October 28, 1991, Congress adopted the emergency amendments passed the year before. The permanent amendments were identical to the temporary amendments, with the exception of the sunset provision whereby the amendments would expire on September 30, 1991. Criminal Jurisdiction Over Indians, Pub.L. No. 102–137, § 1, 105 Stat. 646 (1991) (codified at 25 U.S.C. § 1301(2), (4)). For a time the House of Representatives and the Senate were in disagreement regarding the 1991 legislation. The House wanted to make the 1990 amendments permanent, while the Senate wanted to extend the 1990 amendments until 1993, pending a comprehensive inquiry into the status and abilities of Indian tribal courts. Compare S.R. Rep. 153, 102d Cong., 1st Sess. (1991); with H.R.Rep. No. 61, 102d Cong., 1st Sess. (1991), reprinted in 1991 U.S.C.C.A.N. 370. A compromise was reached whereby the Senate agreed to make the 1990 amendments permanent if the House would agree to investigate the status of the tribal court systems and consider future legislation in that vein. 137 CONG. REC. S14930–03 (statements of Sen. Mitchell). There was never any dispute regarding the substance of the amendments or their purpose in overruling *Duro*.

6. Act of October 28, 1991, Pub.L. No. 102–137, 1991 U.S.C.C.A.N. 105 Stat. 646 (codified at 25 U.S.C. § 1301(2), (4)) simply states that it is "an Act to make permanent the legislative reinstatement, following the decision of Duro against Reina, of the power of Indian tribes to exercise criminal jurisdiction over Indians."

7. Department of Defense Appropriations Act, Pub.L. No. 101–511, 104 Stat. 1856 (1990). Public Law 101–511 is denominated "an Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes," and amends section 1301, paragraph (2) of the Indian Civil Rights Act (ICRA), Pub.L. No. 90–284, Tit. II, 82 Stat. 77 (1968) (codified at 25 U.S.C. §§ 1301–03 (1994)).

8. The Indian Civil Rights Act (ICRA), Pub.L. No. 90–284, Tit. II, 82 Stat. 77 (1968) (codified at 25 U.S.C. §§ 1301–03 (1994)).

9. To the then existing definition of "powers of self-government," the amendment added: "means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." Pub.L. No. 102–137, 1991 U.S.C.C.A.N. 105 Stat. 646 (codified at 25 U.S.C. § 1301(2), (4))

10. The amendment also adds a definition of the term "Indian": Indian means any person who would be subject to the jurisdiction of the united States as an Indian under section 1153, title 18, United States Code if that person were to commit an offense listed in that section in Indian country to which that section applies. Pub.L. No. 102–137, 1991 U.S.C.C.A.N. 105 Stat. 646 (codified at 25 U.S.C. § 1301(2), (4)).

11. The final version of 25 U.S.C. § 1301 now reads: For purposes of this title [the ICRA], the term

> (1) "Indian tribe" means any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government;
> (2) "powers of self-government" means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and including the inherent power of an Indian tribe, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians;
> (3) "Indian court" means any Indian tribal court or court of Indian offense; and
> (4) "Indian" means any person who would be subject to the jurisdiction of the United States as an Indian under section 1153, title 18, United States Code, if that person were to commit an offense listed in that section in Indian country to which that section applies.

Second, tribes retain all rights not expressly taken by Congress. The Committee notes that Congress has the power to acknowledge, recognize and affirm the inherent powers of tribes. The Committee notes that tribes have retained the criminal jurisdiction over non-member Indians and this legislation is not a delegation of this jurisdiction but a clarification of the status of tribes as domestic dependent nations. Hence, the constitutional status of tribes as it existed prior to the Duro decision remains intact.

*See* H.R. REP. NO. 102–61 at 5 (1991) *reprinted in* 1991 U.S.C.C.A.N. 370. Other legislative reports lend credence. The Conference Committee report essentially adopts the House Committee report. *See* H.R. CONF. REP. NO. 102–261, at 3–4 (1991) (noting that "the Committee of the Conference notes that Indian tribal-governments have retained the criminal jurisdictional over non-member Indians and [Pub.L. No. 102–137] is not a delegation of this jurisdiction but a clarification of the status of tribes as domestic dependent nations"). The Senate report similarly contains strong language regarding the inherent status of tribal prosecutorial authority over nonmember Indians:

> From the perspective of most Indian legal scholars and virtually all tribal leaders, the prevailing view is that if Congress had intended to divest Indian tribal governments of jurisdiction over non-Indians, it would have explicitly done so. Instead, the assumption in Congress has always been that tribal governments do have such

jurisdiction, and Federal statutes reflect this view.

S. REP. NO. 102–168, at 3 (1991).

Despite the pronounced congressional intendment that Pub.L. No. 102–137 constitutes an affirmance of a tribe's inherent authority to prosecute both member and nonmember Indians, the court acknowledges that if *Duro* had been predicated upon Constitutional grounds, Congress's ability to overturn *Duro* would be greatly diminished. Accordingly, tribal prosecutorial authority over nonmember Indians is contingent upon an interpretation of the interplay between the *Duro* decision and the resultant legislative correction.[12]

In *Duro,* the Court suggested the necessity of a congressional delegation of prosecutorial authority over nonmember Indians. *Duro,* 495 U.S. at 677, 110 S.Ct. 2053. Reading Public Law 102–137 as a congressional delegation of prosecutorial authority over nonmember Indians, however, would impermissibly eviscerate the congressional intendment and enactment of the legislation. Congress specifically chose an existing statute dealing with tribal governments, and amended the statute to clarify the congressional recognition of the inherent tribal prosecutorial authority over nonmember Indians. Interpreting Public Law 102–137 as a delegation of congressional prosecutorial authority over nonmember Indians would also concede that tribes would be exercising federal power, subject to the full panoply of Constitutional rights. Such an interpretation not only requires dismantling provisions of ICRA,[13] but also fundamentally alters the complex fabric of federal jurisdiction and control in Indian country.[14]

---

**12.** The relevancy of this inquiry derives from the acknowledgment that if the court construes Pub.L. No. 102–137 as a delegation of prosecutorial authority over nonmember Indians, the Winnebago Tribal Court and the federal government would constitute nominally different prosecuting entities initiating successive prosecutions predicated on analogous conduct in violation of the double jeopardy clause.

**13.** The Bill of Rights does not apply to Indian tribal governments. *Duro,* 495 U.S. at 693, 110 S.Ct. 2053; *Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896). The guarantees embodied by the Indian Civil Rights Act of 1968 are not equivalent to their constitutional counter-

parts. *Duro,* 495 U.S. at 693, 110 S.Ct. 2053. There is, for example, no right under the Act to appointed counsel for those unable to afford a lawyer. *See* 25 U.S.C. § 1302(6). Therefore, interpreting Pub.L. No. 102–137 as a congressional delegation of prosecutorial authority, would require amending the Indian Civil Rights Act of 1968 to incorporate the Bill of Rights. *Duro,* 495 U.S. at 693, 110 S.Ct. 2053 (concluding that Congress is prohibited from authorizing criminal proceedings before tribunals that do not provide constitutional protections as a matter of right).

**14.** Aside from the possible Fifth Amendment implications of interpreting Pub.L. No. 102–137 as

The complexity of federal jurisdiction and control in Indian country began with the incorporation of Indian tribes into the United States territory. Prior to colonization, tribes were self-governing sovereign political communities with inherent powers "to prescribe laws for their members and to punish infractions of those laws." *Wheeler*, 435 U.S. at 322–23, 98 S.Ct. 1079. Upon incorporation into the United States, Indian tribes were necessarily divested of some aspects of sovereignty which Indian tribes had previously exercised. *Wheeler*, 435 U.S. at 323, 98 S.Ct. 1079. The surviving sovereign powers of Indian tribes are: (1) "inherent powers of limited sovereignty which [have] never been extinguished;" *Wheeler*, 435 U.S. at 313, 98 S.Ct. 1079 (*quoting* Felix S. Cohen, Handbook of Federal Indian Law 122 (1945 ed.)); (2) "existing only at the sufferance of Congress; and (3) subject to [limitation or] complete defeasance" "by treaty or statute, or by implication as a necessary result of their dependent status." *Id.* at 323, 98 S.Ct. 1079.

This description of surviving sovereign powers, however, begs the question. In determining whether tribal sovereignty has been divested by treaty, statute, or by implication, the Court must discern congressional intent by examining the relevant historical legislative background. In both *Duro* and *Oliphant*, the Court relied, *inter alia*, on a historical legislative background to infer that upon incorporation, tribal authority was tacitly divested. *See Oliphant*, 435 U.S. at 199–206, 98 S.Ct. 1011; *Duro*, 495 U.S. at 689–93, 110 S.Ct. 2053. The Court's inferential reasoning pertaining to the tacit divestiture of tribal authority over nonmember Indians, reveals the predicate of the *Duro* decision: the federal common law.[15]

Within the confines of the federal common law, the distillation of the interplay between the *Duro* decision and Public Law 102–137 becomes possible. It is axiomatic that the legitimacy of a the federal common law is contingent upon the presence of a connection, however tenuous, to a determination of congressional intent. Accordingly, if a judicial body errs in determining congressional intent, Congress can permissibly legislate a correction. Public Law 102–137 constitutes such a correction. Congress perceived the Duro decision as "[r]eversing two hundred years of the exercise by tribes of criminal misdemeanor jurisdiction over all Indians". S. REP. NO. 102–153, at 2 (1991). The legislative history accompanying Public Law 102–137 affirms that "[t]hroughout the history of this country, the Congress has never questioned the power of tribal courts to exercise misdemeanor jurisdiction over nonmember Indians in the same manner that such courts exercise misdemeanor jurisdiction over tribal members." S. REP. NO. 102–153, at 2 (1991). Accordingly, Congress acted to reaffirm the inherent tribal authority to prosecute nonmember Indians for misdemeanor offenses. *See generally,* 137 CONG. REC. H2988–02 (report on H.R. 972) (stating that the amendments seek "to assure Indian tribes of their jurisdiction over misdemeanor crimes committed on their lands by Indians who are not members of their tribe. The

---

a delegation of prosecutorial authority over nonmember Indians, prohibiting Congress from correcting a judicial determination of implicit divestiture would enable the Court sua sponte to determine the tribal powers that were lost upon incorporation. Such a judicial fiat would effectively dismantle inviolable notions of tribal sovereignty by vis a vis impinging upon adamantine jurisprudence enunciated by Justice John Marshall in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831); and *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). In enacting Pub.L. No. 102–137, Congress sought to avoid this result. *See* H.R. CONF. REP. NO. 102–261 (1991) (reaffirming that Congress determines Indian policy; Indian tribes retain all rights and powers not expressly divested by Congress; and that these principles go back to the decisions of Chief

Justice John Marshall and are part of the foundation of the federal tribal relation. *See Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832)).

15. L. Scott Gould, *The Consent Paradigm: Tribal Sovereignty at the Millennium*, 96 COLUM. L. REV. 809, 853 (1996) ("Oliphant and Duro were not constitutional decisions, [rather,] they were founded instead on federal common law"); Philip S. Deloria & Nell J. Newton, *The Criminal Jurisdiction of Tribal Courts over Non–Member Indians: An Examination of the Basic Framework of Inherent Tribal Sovereignty Before and After Duro v. Reina*, 38 FED. B. NEWS & J. 70, 72 (1991). Congress specifically relied on the expertise of Prof. Nell J. Newton in formulating Pub.L. No. 102–137. *See* H.R. REP. NO. 103–205 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2425; S. REP. NO. 102–168, 1991.

Committee is clarifying an inherent right which tribal governments have always held and was never questioned"); 137 CONG. REC. E2165-04 (statement of Rep. Geo. Miller) (stating that "we make these corrections to make clear the committee's acknowledgment of the fact that tribes—first, have always been able to exercise misdemeanor criminal jurisdiction over all Indians on tribal lands; second, that Congress never took the jurisdiction away; and third, that tribes clearly retain this jurisdiction as self-governing entities and as keepers of the peace on their homelands").

Upon review and consideration, the court finds and concludes, that Pub.L. No. 102–137 accords the judiciary its proper and appropriate scope while preserving sacrosanct notions of congressional power to set the parameters of Indian law,[16] within constitutional confines. Here, where Congress is merely affirming a power that Indian tribes have had from time immemorial, the court should also defer to Congress.

■ Accordingly, the court finds and concludes, that (1) by prosecuting Weaselhead, the Winnebago Tribe exercised its inherent sovereignty to prosecute nonmember Indians; (2) the Winnebago Tribe and the federal government are separate sovereigns for the purpose of the Double Jeopardy clause of the Fifth Amendment; (3) this subsequent federal prosecution of Weaselhead does not violate the Double Jeopardy clause of the Fifth Amendment. *See Heath,* 474 U.S. at 88, 106 S.Ct. 433, *quoting Moore v. Illinois,* 55 U.S. 13, 19, 14 How. 13, 14 L.Ed. 306 (1852); *Pena,* 67 F.3d at 155; and (4) the exercise of inherent tribal prosecutorial authority rather than delegated federal power precludes any tribal prosecutorial promises from binding the United States Attorney.

THEREFORE, IT IS ORDERED

(1) That filing no. 32, the "Report and Recommendation" of Magistrate Judge Thomas D. Thalken is affirmed as modified;

(2) That upon this court's de novo review of the record, the "Motion to Suppress Statements and Request for Oral Argument and Evidentiary Hearing" (filing no. 26), filed by the defendant, Robert Lee Weaselhead, Jr., is denied;

(3) That upon this court's de novo review of the record, the "Motion to Dismiss Indictment and Request for Evidentiary Hearing and Oral Argument" (filing no. 10), the filed by the defendant, Robert Lee Weaselhead, Jr., is denied;

(4) That upon this court's de novo review of the record, the "Amended Motion to Dismiss Indictment and Request for Evidentiary Hearing and Oral Argument" (filing no. 24), the filed by the defendant, Robert Lee Weaselhead, Jr., is denied; and

(5) That filing no. 33, the "Objections to the Report and Recommendation of Magistrate Judge Thomas D. Thalken," filed by the plaintiff, the United States of America, is sustained in accordance with this order.

---

16. In *Morton v. Mancari,* the Supreme Court declared:

> The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. Article I, section 8, clause 3, provides Congress with the power to "regulate commerce ... with the Indian tribes" .... Article

II, section 2, clause 2, gives the President the power, by and with the advice and consent of the Senate, to make treaties.

417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Duro,* 495 U.S. at 698, 110 S.Ct. 2053 (noting that Congress has the ultimate authority over Indian affairs).