**UNITED STATES of America,**
**Plaintiff,**

v.

**James ARCHAMBAULT, a/k/a**
**James Skunk, Defendant.**

No. CR 00–30089.

United States District Court,
D. South Dakota,
Central Division.

May 24, 2002.

David L. Zuercher, Assistant United States Attorney, Pierre, SD, for Plaintiff.

Edward G. Albright, Federal Public Defender's Office, Pierre, SD, for Defendant.

## ORDER

KORNMANN, District Judge.

Defendant filed a motion to dismiss (Doc. 26) which motion was based on claims of double jeopardy, claimed violations of constitutional rights of due process and equal protection, and a claimed bill of attainder. The parties initially briefed the issues: U.S. Magistrate Judge Moreno conducted a hearing at which certain facts were stipulated and defendant was permitted to supplement the record (H. Tr. 8–10, Doc. 30). The magistrate filed and served a report and recommendation (Doc. 35), recommending that the motion be denied.

■ I conducted a *de novo* review of the transcript of the hearing and all the files and records as they existed at that time. Defendant timely filed objections and a request for a remand, or more correctly for a recommittal (Doc. 45). One basis for the recommendation to deny the motion was the Eighth Circuit's *en banc* decision in *United States v. Weaselhead,* 165 F.3d at 1209. The opinion of the district court, *United States v. Weaselhead,* 36 F.Supp.2d 908 (D.Neb.1997), was affirmed by an equally divided court. The portion of the report and recommendation of the magistrate relying in part on the *en banc* decision was rejected by me as an erroneous statement of the law. The *en banc* decision is not binding precedent. Decisions by an equally divided court decide only the particular case. They have no precedential effect. They have a *res judicata* effect but not a *stare decisis* effect. *See Loeffler v. Tisch,* 806 F.2d 817 (8th Cir. 1986), *United States v. Grey Bear,* 863 F.2d 572 (8th Cir.1988), *Redding v. Minnesota,* 881 F.2d 575 (8th Cir.1989), and *United States v. Payne,* 940 F.2d 286 (8th Cir.1991).

As to the balance of the original report and recommendation, I acted pursuant to 28 U.S.C. § 636(b)(1)(C) to recommit the matter to the magistrate for two reasons. First, neither the parties nor the magistrate initially gave consideration to a case decided by the United States Supreme Court on June 25, 2001, *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398. Nor was any consideration given to *Hicks* by any judge in *United States v. Enas,* 255 F.3d 662 (9th Cir.2001). While *Hicks* is a civil case and thus not "on point", the various Justices discuss in *Hicks* the various aspects of tribal court jurisdiction. It can be argued that the opinion of the Supreme Court is that any tribe's adjudicative jurisdiction over non-

members is at most only as broad as the jurisdiction granted legislatively by Congress. Second, I initially believed that the additional evidence sought by the defendant might be relevant. At a minimum, I believed that the defendant was entitled to have all such evidence a part of the record, either as admitted into evidence or as an offer of proof. I therefore, on July 26, 2001, recommitted the matter (Doc. 46) with instructions to the magistrate.

The magistrate proceeded in accordance with the order of recommittal. Defendant filed and served an offer of proof (Doc. 85). The magistrate served and filed a supplemental report and recommendation (Doc. 93). Defendant served and filed objections (Doc. 97) to the supplemental report and recommendation. I again gave *de novo* consideration to all documents and records in this case. I denied the motion of the defendant to dismiss, adopted the supplemental report and recommendation with some modifications, overruled the objections of the defendant, and rejected the offer of proof made by the defendant. *See United States v. Archambault*, 2001 DSD 36, 174 F.Supp.2d 1009 (D.S.D.2001).

Defendant's then attorney did not timely file the notice of interlocutory appeal and the United States Court of Appeals for the Eighth Circuit dismissed the appeal as untimely (Doc. 125) on December 19, 2001. The mandate (Doc. 125) issued on February 5, 2002. Defendant then moved to extend the time in which to appeal (Doc. 112) which motion was also untimely and beyond the jurisdiction of the district court. I entered an Order (Doc. 115) denying the motion. I expressed puzzlement as to why the case was dismissed without remanding the case to the district court for a determination of excusable neglect in accordance with Fed.R.Crim.P. § 4(b)(4), this having been the practice previously. *See United States v. Anna*, 843 F.2d 1146, 1147–48

(8th Cir.1988), and *United States v. Petty*, 82 F.3d 809, 810 (8th Cir.1996) (*per curiam*). In fact, the posture of the present case at that time was remarkably similar to that in *Petty*. Defendant's previous counsel was permitted to withdraw and new counsel was appointed.

Predictably, new counsel filed another motion to dismiss (Doc. 132) and we are covering largely the same ground covered previously. The magistrate judge again issued a report and recommendation (Doc. 149) after having conducted an evidentiary hearing. I have read that and I am giving *de novo* consideration to all the files and records herein, including three transcripts (Docs. 151, 152, and 153). I have also considered the objections filed by the defendant (Doc. 162).

The issue squarely before the court previously and now has not been directly decided by the United States Supreme Court or by the United States Court of Appeals for the Eighth Circuit. Despite the *Hicks* case and the other Supreme Court cases indicating skepticism as to any claimed "inherent sovereignty" of Indian tribes acting through their tribal courts, it is not the function of a district court to predict what the Supreme Court will do in a given case. It is a virtual certainty that this new ruling on the motion to dismiss, however decided, will be appealed and the Eighth Circuit will again be presented with the "opportunity" to rule on the same issue presented in *United States v. Weaselhead*, 156 F.3d 818 (8th Cir.1998). Although the panel decision was vacated on December 4, 1998, it is difficult to add to the scholarly discussions in both the panel opinion by then Chief Judge Wollman and the dissent by Judge Morris Sheppard Arnold. It is also difficult to add to the scholarly opinion of United States District Judge Thomas Shanahan in *United States v. Weaselhead*, 36 F.Supp.2d 908 (D.Neb.1997). We do

not know, based upon a different make-up of the Court of Appeals, whether the views of then Chief Judge Wollman or Judge Morris Sheppard Arnold will carry the day. Indeed, their views of the law may have changed.

Defendant Archambault, like Mr. Weaselhead, is an Indian prosecuted by a tribe (in this case the Cheyenne River Sioux Tribe) as to which he is not an enrolled member. Archambault, like Weaselhead, pled guilty to having violated the tribal code and was later prosecuted for the exact same conduct by the United States government. Archambault admitted in tribal court to having assaulted and injured his domestic companion, a member of the Cheyenne River Sioux Tribe, and that the assault occurred on the reservation. Archambault, like Weaselhead, claims double jeopardy, the claim being that the tribe had no inherent authority to prosecute him and that the only basis for such authority springs from a federal statute. Thus, as the argument goes, the two prosecutions stem from the same authority, the United States government, the bottom line being that only one sovereign is involved as to Archambault. Obviously, if the tribal prosecution was based on inherent tribal sovereignty, two sovereigns are involved as to Archambault and there is no double jeopardy.

I will not repeat all that was said in my previous opinion and I incorporate those thoughts and conclusions by reference. *See United States v. Archambault,* 2001 DSD 36, 174 F.Supp.2d 1009 (D.S.D.2001).

Magistrate Moreno has ably expanded in his report and recommendation on what he and I wrote previously. I agree fully with his additional conclusions and rationale and adopt them by reference as well. He has correctly permitted the defendant to present a proffer as to federal expenditures for law enforcement officials, prosecutors and court personnel acting on the Cheyenne River Sioux Indian Reservation.

 Again, I believe that we are dealing with a matter of federal common law. I do not believe the Congress acted beyond its authority. I do not believe that *Duro* was founded on constitutional principles but rather on a finding by the judiciary as to what the federal common law was. Federal common law has, since *Duro,* been clarified by Congress. It now exists just as Felix Cohen described it in 1945 in the first compendium of federal Indian law, Handbook of Federal Indian Law, namely that the rights of a tribe to sovereignty and self-government are only restricted if the federal government, acting through the Congress, expressly extinguishes those rights, wholly or in part. Mr. Cohen was quoted in *United States v. Wheeler,* 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), to the effect that tribes possess "inherent powers of a limited sovereignty which has never been extinguished." By virtue of the action of the United States Congress declaring the federal common law, the tribe here exercised inherent sovereignty. There is no double jeopardy and the motion to dismiss should be denied. The motion should also be denied as to the claims of a bill of attainder and as to claims of violations of constitutional rights of due process and equal protection. Nonmember Indians will simply be subjected to the same tribal court systems as member Indians. Indians who choose to leave their own reservations and live on another reservation make such choices in a conscious manner. They will receive the same treatment and rights as all other Indians living on that particular reservation.

Now, therefore,

IT IS ORDERED, as follows:

1) The conclusions of the report and recommendation (Doc. 149) and the previous published opinion (Doc. 101) are adopted..

2) The objections of the defendant (Doc. 162) are overruled.

3) The motion to dismiss the indictment (Doc. 125) is denied.

## REPORT AND RECOMMENDATION FOR DISPOSITION OF DEFENDANT'S MOTION TO DISMISS INDICTMENT

MORENO, United States Magistrate Judge.

### I.

[¶ 1] After his interlocutory appeal was dismissed by the Eighth Circuit Court of Appeals for lack of jurisdiction, Docket No. 125, defendant, James Archambault, aka James Skunk (Archambault) filed another Motion to Dismiss the indictment, with an accompanying memorandum in support thereof, Docket Nos. 132–33. In his second Motion, like the first one, Archambault seeks to dismiss the indictment on double jeopardy, equal protection and due process grounds. The gravamen of Archambault's dismissal Motion is substantively the same as his previous one. Even so, this Court has considered the Motion, together with the evidence and testimony presented in support of the same, and concludes that it should be denied for the reasons that were thoroughly discussed and analyzed by the Court and the District Court in *United States v. Archambault,* 174 F.Supp.2d 1009 (D.S.D.2001) (*Archambault I*). Nevertheless, having conducted additional research and given the matter more thought, the Court believes it is appropriate, in view of the important and controversial nature of the issues at stake, to augment what was said in *Archambault I* with several important points and observations.

### II.

[¶ 2] Preliminarily, following the District Court's order adopting this Court's reports and recommendations, a federal court in North Dakota squarely addressed the issue of whether double jeopardy bars a subsequent prosecution of a non-member Indian who had been convicted in tribal court for the same offense. *United States v. Lara,* No. C2–01–58, 2001 WL 1789403 (D.N.D. Nov.29, 2001). The North Dakota court, after examining the relevant case law including *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), *United States v. Weaselhead,* 36 F.Supp.2d 908 (D.Neb.1997), *aff'd by an equally divided court,* 165 F.3d 1209 (8th Cir.) (en banc), *cert. denied,* 528 U.S. 829, 120 S.Ct. 82, 145 L.Ed.2d 70 (1999), *United States v. Enas,* 255 F.3d 662 (9th Cir.2001) (en banc), *cert. denied,* —— U.S. ——, 122 S.Ct. 925, 151 L.Ed.2d 888 (2002) and *Archambault I,* determined that:

1. The ICRA amendment was a valid recognition of the inherent power of Indian tribes to prosecute non-member Indians;

2. The prosecutorial authority of the Spirit Lake Tribe and of the United States were derived from independent sources; and

3. Because the dual sovereignty doctrine applies, subsequent federal prosecution of the defendant, for the same offense he was convicted of tribally, was not barred by the Double Jeopardy Clause.

*Lara,* 2001 WL 1789403 at *3–4.

[¶ 3] Moreover, in the aftermath of *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) and *Enas,* at least one commentator has revisited the double jeopardy issue raised by Archambault and

"agrees with the position taken by other scholars that judicially divested tribal powers should be treated as having been preempted by federal common law" and that the decision in *Enas* was "correct". Alex Tallchief Skibini, *Making Sense Out of Nevada v. Hicks: A Reinterpretation,* 14 St. Thomas L.Rev. 347, 365 (2001); *see also,* Phillip P. Frickey, *A Common Law For Our Age of Colonialism: The Judicial Divestiture Of Indian Tribal Authority Over Non-members,* 109 Yale L.J. 1, 67–68 & n. 322 (1999); Nell Jessup Newton, *Permanent Legislation To Correct Duro v. Reina,* 17 Am. Indian L.Rev. 109, 118–19 (1992). In this commentator's view, "Congress can reaffirm the inherent powers of Indian tribes without delegation of federal authority to the tribes." Skibini, 14 St. Thomas L.Rev. at 367.

### III.

[¶ 4] Congress enacted the 1990 Indian Civil Rights Act (ICRA) amendment to restore the criminal jurisdiction that *Duro* found that tribes had lost. The text of the amendment clearly reflects Congress's intent to authorize tribes to act in their own sovereign capacities, not as instrumentalities of the United States, in prosecuting non-member Indians. The amendment modified ICRA's definition of tribal "powers of self-government" to include "the *inherent power* of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." 25 U.S.C. § 1301(2) *(emphasis added).* Jurisdiction that is exercised as a "power[] of

self-government" necessarily refers to jurisdiction that is based on and derived from tribal sovereignty. In passing the amendment, Congress expressly "recognized" and "affirmed" the existence of that jurisdiction as an "inherent" tribal power, not as "delegated", federal power.

[¶ 5] The legislative history of the 1990 ICRA amendment provides additional support for this conclusion. The Senate Report, for instance, explains that the amendment was intended "to recognize and reaffirm the *inherent authority* of tribal governments to exercise criminal jurisdiction over all Indians." S.Rep. No. 168, 102d Cong., 1st Sess. 4 (1991) *(emphasis added).* Likewise, the House Report states that "this legislation is *not a federal delegation* of jurisdiction but a clarification of the status of tribes as domestic independent nations." H.R.Rep. No. 61, 102d Cong., 1st Sess. 7 (1991) *(emphasis added ).*[1]

[¶ 6] This Court can find nothing in the Supreme Court's decisions that precludes Congress from recognizing or restoring an aspect of the inherent sovereign power of tribes that otherwise could not be exercised after their incorporation into the Union. To the contrary, the Court has indicated on a number of occasions that Congress may authorize an "exercise of tribal power" that would be inconsistent with the dependent status of the tribes in the absence of such authorization. *See e.g., Hicks,* 533 U.S. at 359–60, 121 S.Ct. 2304; *Montana v. United States,* 450 U.S.

---

1. The legislative history indicates that Congress may have sought not only to prospectively remove the federal law impediment to the exercise of inherent tribal power, but also to retroactively overrule *Duro's* interpretation of federal Indian law as it stood at the time of the Supreme Court's decision. *See Mousseaux v. United States,* 806 F.Supp. 1433, 1440–43 (D.S.D.1992) (holding that the 1990

ICRA amendment should be given retroactive effect and that the same defeats the defendant's claims under *Duro* ), *aff'd on other grounds,* 28 F.3d 786 (8th Cir.1994). As discussed later herein, *see infra,* p. 1018, whether the 1990 ICRA amendment was intended to apply retroactively, is not an issue in this case.

544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

## IV.

[¶ 7] Archambault contends that under *Duro*, the relationship between the sovereign authority of the United States and that of Indian tribes is "constitutionally based" and cannot be altered by Congress. This contention is an erroneous one. The Constitution does not define the precise extent of residual tribal sovereignty. Rather, sovereignty of tribes has been subject to adjustment by federal treaties and statutes; where Congress has not spoken on the issue, tribal sovereignty is a matter of federal common law. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16–19, 8 L.Ed. 25 (1831) (Marshall, C.J.); *see also, Duro*, 495 U.S. at 688–92, 110 S.Ct. 2053 (assessing the extent of tribal criminal jurisdiction by reference to non-constitutional sources including statutes, treaties and federal court practice); *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) (observing that " 'Indian law' draws principally on the treaties drawn and executed by the executive branch and legislation passed by Congress", which "beyond their actual text form the backdrop for the intricate web of judicially made Indian law"). The Supreme Court has "always recognized that federal common law is 'subject to the paramount authority of Congress' ". *Milwaukee v. Illinois*, 451 U.S. 304, 313, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (*quoting New Jersey v. New York*, 283 U.S. 336, 348, 51 S.Ct. 478, 75 L.Ed. 1104

(1931)). The 1990 ICRA amendment, therefore, represents an appropriate exercise of Congress's authority to modify federal common law.

[¶ 8] The Supreme Court has made clear that Congress may, in the exercise of its "plenary" authority over Indian affairs, *see Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), remove restraints that may otherwise exist under federal law to tribes' exercise of their inherent sovereign powers. *See e.g., Negonsott v. Samuels*, 507 U.S. 99, 103, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (Congress has "plenary authority to alter" the allocation of criminal jurisdiction in Indian country); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) ("Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess."); *United States v. Mazurie*, 419 U.S. 544, 556–59, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (Congress may authorize a tribe to regulate the sale of alcoholic beverages by non-Indians on privately-owned lands within a reservation's boundaries). Moreover, when one Congress, with the consent of a tribe, has terminated federal recognition of a tribe, a subsequent Congress may repeal the termination act and reinstate all of the tribe's preexisting rights and privileges.[2]

## V.

[¶ 9] The fact that *Duro* makes reference to due process and equal protection con-

2. *Compare* Menominee Indian Termination Act of 1954, Pub.L. No. 399, 68 Stat. 250 (1954) *with* Menominee Restoration Act, Pub.L. No. 93–197, 87 Stat. 770 (1973) (codified at 25 U.S.C. §§ 903–903f); *see also,* 25 U.S.C. § 861(b), (c) (repealing termination of federal supervision over certain Indian tribes in Oklahoma and "reinstat[ing] all rights and privileges of each of the tribes ... and their members under federal treaty, statute or otherwise"). Congress's authority to restore federal recognition to a tribe has not been questioned. Nor has it ever been suggested that re-recognized tribes exercise federal, as opposed to tribal, powers when they carry out their governmental activities.

cerns, *see* 495 U.S. at 692–96, 110 S.Ct. 2053, does not make it a "constitutionally-based" decision. Admittedly, the *Duro* Court did indicate that Congress might be constrained by the due process and equal protection components of the Fifth Amendment[3] from subjecting United States citizens to criminal proceedings before a tribunal that does not provide the full panoply of federal constitutional rights. 495 U.S. at 693–94, 110 S.Ct. 2053. But the actual question of whether Congress could *constitutionally* take such a step with respect to tribal courts was not before the Court in that case.[4]

■ [¶ 10] The 1990 ICRA amendment does not, on its face, violate equal protection or due process guarantees. The Supreme Court has rejected equal protection challenges to statutes that treat Indians and non-Indians differently— including statutes governing criminal and civil jurisdiction in Indian country— where the classification is rationally related to the United States' unique trust responsibilities to Indians. *United States v. Antelope*, 430 U.S. 641, 645–50, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977); *see also, United States v. Eagleboy*, 200 F.3d 1137, 1138–40 (8th Cir.1999)

(policy that exempted member, but not non-member, Indians from possessing migratory bird parts was based on the special trust obligations owed by the government to tribes and did not violate equal protection statutes) *Alaska Chapter, Associated General Contractors v. Pierce*, 694 F.2d 1162, 1166–70 (9th Cir.1982) (upholding constitutionality of Indian preference revision in 25 U.S.C. § 450e(b) where the classification was rationally related to Congress's trust responsibility toward Indians). For example, the Court upheld 18 U.S.C. § 1153, which subjects Indians, but not non-Indians, to federal prosecution for certain offenses committed in Indian country. *Antelope*, 430 U.S. at at 642–43, 650, 97 S.Ct. 1395. In doing so, the Court explained that § 1153, like other federal laws that treat Indians differently from non-Indians, is "based neither in whole nor in part upon impermissible racial classifications," but instead is "rooted in the unique status of Indians as 'a separate people' with their own political institutions." 430 U.S. at 646–47, 97 S.Ct. 1395; *see also, Eagleboy*, 200 F.3d at 1139–40; *United States v. Keys*, 103 F.3d 758, 761 (9th Cir.1996). The Court noted that the

**3.** Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has reverse incorporated the Equal Protection Clause of the Fourteenth Amendment into the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). In doing so, the Court reasoned that "it would be unthinkable that the same Constitution would impose a lesser duty on the federal government." *Id.*

**4.** This brings up another important issue. Interpreting the 1990 ICRA amendment as a congressional delegation of federal authority, which Archambault maintains should be done, poses significant problems. Indeed, in light of *Duro*, this Court has grave doubts as to whether Indian tribes can exercise federal power delegated to them by Congress over non-member Indians without granting these Indians all of the protections guaranteed by

the United States Constitution. Congress is not able to delegate what it does not have, and because it does not have the power to prosecute non-member Indians without affording them the full protection of the Constitution, it cannot in turn empower tribes to do this very thing. *See* Skibini, 14 St. Thomas L.Rev. at 364 & n. 114; *see also* L. Scott Gould, *Mixing Bodies and Beliefs: The Predicament of Tribes*, 101 Columbia L. Rev, 702, 707 (2001). Any such interpretation would subject non-member Indians and other United States citizens to tribal criminal prosecution without all of their constitutional entitlements and would, in all probability, result in a constitutional challenge under *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) and like cases. *See Duro*, 495 U.S. at 693–94, 110 S.Ct. 2053.

Indian defendants did not seriously contend that the statute failed to satisfy the rational basis standard applicable to non-suspect classifications. *Antelope,* 430 U.S. at 647, n. 8, 97 S.Ct. 1395.[5] The ICRA amendment's recognition of tribal criminal jurisdiction over "all Indians" is rationally related to Congress's twin goals of promoting tribal self-government and eliminating the potentially significant jurisdiction gap in law enforcement left by *Duro.*

[¶ 11] As for any due process concerns, ICRA itself guarantees that a defendant in tribal court shall not be "[d]eprived" .... of liberty without due process of law. 25 U.S.C. § 1302(8). While ICRA does not guarantee every right secured by the Constitution, Archambault does not allege that the tribal court deprived him of a constitutional right. Even if a federal due process right not provided by ICRA or tribal law, such as the right to appointed counsel for indigent defendants, must be assured before a tribal court may exercise jurisdiction over a non-member Indian, the solution is not to disable tribal criminal jurisdiction, but simply to require that the tribe elect between providing counsel and foregoing incarceration as a sentencing option. *See Argersinger v. Hamlin,*

407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).[6]

[¶ 12] In any event, the appropriate way for Archambault (or any other non-member Indian for that matter) to raise equal protection and due process objections to the exercise of criminal jurisdiction by a tribe or to the procedures applicable in tribal court is to present and seek a ruling on these objections as part of his tribal prosecution. Then, if the tribal court does not provide him relief, his objections can be made to the District Court *vis a vis* a petition for habeas corpus under 25 U.S.C. § 1303 challenging "the legality of [his] detention by order of an Indian tribe." Archambault at no time ever raised any such objections during or in connection with his tribal court proceedings.

## VI.

[¶ 13] Whether or not *Duro* definitively adjudicated the extent of tribal sovereignty as of the date of that decision (May 29, 1990), and whether Congress had the authority to retroactively "overrule" such an interpretation of law by the Supreme Court are issues that need not be resolved here. It will suffice to say that this case

---

**5.** Similarly, in *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (*per curiam*), the Supreme Court held that denying tribal members access to the state court forum available to non-Indians did not "constitute impermissible racial discrimination." 424 U.S. at 390, 96 S.Ct. 943. According to the Court, "such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government." *Id.* at 391, 96 S.Ct. 943 (*citation omitted); see also, Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 502, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (rejecting Indian tribe's equal protection challenge to a state's partial assumption of criminal jurisdiction pursuant to Public Law 280, whereby non-Indians, but not Indians, were subject to state

prosecution for crimes committed on trust or restricted land within the reservation); *Morton,* 417 U.S. at 551–52, 94 S.Ct. 2474 ("the unique legal status of Indian tribes under federal law" permits the government to enact legislation singling out Indians, legislation that might otherwise be constitutionally offensive).

**6.** A number of tribes, including the Rosebud Sioux Tribe, provide counsel to indigent criminal defendants in tribal court as a matter of tribal law or policy. *See e.g. United States v. Red Bird,* 146 F.Supp.2d 993, 997, 1007 (D.S.D.2001). Congress has authorized funding for entities that provide legal assistance to criminal defendants in tribal court under the Indian Tribal Technical & Legal Assistance Act of 2000, codified at 25 U.S.C. § 3663.

involves only a *prospective* change in the scope of tribal sovereignty. No issue of retroactivity is presented. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 304–05, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("Congress' decision to alter the rule of law established in one of our cases—... to 'legislatively overrul[e]'— does not, by itself, reveal whether Congress intends the 'overruling' statute to apply retroactively to events that would otherwise be governed by the judicial decision. ... Because retroactivity raises special policy concerns, the choice to enact a statute that responds to a judicial decision is quite distinct from the choice to make the responding statute retroactive."); *but see Mousseaux,* 806 F.Supp. at 1441–43 (recognizing tribal court jurisdiction over offense committed by non-member Indian prior to the 1990 ICRA amendment's effective date and suggesting that the amendment conferred no new power to tribe).

## VII.

[¶ 14] Archambault forcefully argues that the power of the Cheyenne River Sioux Tribe (CRST) to exercise criminal jurisdiction over non-member Indians like himself exists only by virtue of a "delegation" from Congress. The use of the term "delegation", however, is consistent with the notion that tribes prosecute non-member Indians pursuant to the 1990 ICRA amendment, in the exercise of tribal power, not federal power. In fact, the Supreme Court has on several occasions referred to the restoration of tribal sovereign power as a "delegation" by Congress. *See Montana,* 450 U.S. at 564, 101 S.Ct. 1245 (preempted "tribal power ... cannot survive without express congressional delegation"); *accord, South Dakota v. Bourland,* 508 U.S. 679, 695 n. 15, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993); *Merrion v.*

*Jicarilla Apache Tribe,* 455 U.S. 130, 171, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

[¶ 15] The Supreme Court has also recognized that when Congress "delegates" authority to an entity possessing attributes of sovereignty, such as a state, the entity exercises that power in its own sovereign capacity, not as an instrumentality of the federal government. *See Prudential Insurance Company v. Benjamin,* 328 U.S. 408, 438, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) (although a state tax on insurance companies was permissible only because of the McCarran–Ferguson Act, the tax was imposed by the state as an "exertion of its own power", and accordingly was not subject to constitutional constraints on the federal government's taxing power); *see also, Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 398–400, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (an agency formed under an interstate compact authorized by Congress acts as a state, not federal, agency); *Pink v. Modoc Indian Health Project, Inc.,* 157 F.3d 1185, 1188 (9th Cir.1998) (tribal sovereign authority extends to non-profit corporation established by the tribes to administer federal program), *cert. denied,* 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999).

[¶ 16] Even if Congress was constitutionally barred from "recogniz[ing] and affirm[ing]" the tribes' sovereign authority to exercise criminal jurisdiction over "all Indians" on their reservations, 25 U.S.C. § 1301(2), Archambault's double jeopardy claim must nonetheless fail. Nothing in the text, purpose or legislative history of the 1990 ICRA amendment demonstrates or even suggests that Congress intended to make tribes instrumentalities of the United States for these purposes. Any such action would create innumerable difficulties for law enforcement in Indian country that Congress most assuredly could

not have intended. More importantly, given the circumstances surrounding *the* introduction and passage of the 1990 ICRA amendment, Congress would have obviously understood that, if tribes were acting as instrumentalities of the United States in prosecuting non-member Indians, a potential double jeopardy bar would exist to a federal prosecution after a tribal prosecution involving the same offense.[7] *See United States v. Wheeler,* 435 U.S. 313, 330–31, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (noting that the prospect of avoiding a more severe federal punishment would motivate tribal members to plead guilty first to tribal offenses, which carry only misdemeanor-type penalties). Yet, Congress gave no signal of its intention to take away federal prosecutorial power in this situation.

[¶ 17] If Congress's attempt in the 1990 ICRA amendment to recognize the sovereign authority of tribes to prosecute non-member Indians is invalid, that would mean that CRST lacked criminal jurisdiction over Archambault. Assuming this to be true, jeopardy would not have attached in Archambault's tribal prosecution for purposes of the Double Jeopardy Clause. *See California v. Mesa,* 813 F.2d 960, 963, n. 5 (9th Cir.1987) (under both federal and state law, jeopardy does not attach if the state trial court lacked subject matter jurisdiction), *aff'd sub nom,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989); *see also United States v. Phelps,* 168 F.3d 1048, 1053–54 (8th Cir.1999) (concluding that the Double Jeopardy Clause had not been vio-

lated in a federal prosecution, which followed a prosecution in tribal court for the same conduct, because the tribe did not have jurisdiction to enforce its laws against a non-Indian defendant). Of course, if jeopardy did not attach in Archambault's tribal prosecution, a subsequent federal prosecution would not put him twice in jeopardy and thereby create a double jeopardy bar to his federal prosecution. As a result, the denial of Archambault's Motion to Dismiss should stand, irrespective of the correctness of the interpretations made by this Court and the District Court as to the validity of the 1990 ICRA amendment.

## VIII.

[¶ 18] Lastly, whether or not the United States has an all encompassing financial "presence" in CRST's court system and its law enforcement agency does not make the Tribe an "arm" of the United States. *See Wheeler,* 435 U.S. at 327–28, 98 S.Ct. 1079. Significantly, Archambault still has not shown whether any of the financial assistance received from the United States was used by the Tribe in connection with crimes committed by non-member Indians, and if so, the extent this was done. If the lion's share of the assistance was utilized by the Tribe for criminal matters relating to its own members, Archambault's double jeopardy claim must fail. *See Wheeler,* 435 U.S. at 322–30, 98 S.Ct. 1079.

[¶ 19] The claim must fail for another reason as well. If accepted and extrapo-

---

7. Congress would have also understood, in the face of *Duro,* that other potential constitutional issues could be implicated if the 1990 ICRA amendment was treated as an affirmative delegation of power to Indian tribes. *Duro* had made clear that non-Indians and non-member Indians were similarly situated for purposes of tribes' exercise of criminal jurisdiction, 495 U.S. at 696, 110 S.Ct. 2053, so any authority delegated to tribes by Con-

gress over non-member Indians, but not over non-Indians, might well present equal protection problems. In addition, *Duro* hinted that a congressionally delegated grant of criminal jurisdiction over non-members— whether Indian, non-Indian, or both— to tribes which was not subject to the Bill of Rights or other constitutional constraints, would contravene the Due Process Clause, 495 U.S. at 693, 110 S.Ct. 2053.

lated out, such a claim would "federalize" almost every aspect and function of tribal government, stripping tribes, like CRST, of their soverignty. Aside from this, what about state and local agencies/programs that the United States provides all or most of the funding for? The fact that these agencies/programs are federally funded, in whole or in part, does not transform the governmental entities that run them into de facto subsidiaries of the United States.

[¶ 20] Regardless, the questions in this case are essentially legal, not factual, ones that involve convoluted issues of constitutional law, particularly in the realm of separation of powers. It is in this domain that Archambault's dismissal Motion should be surveyed and ultimately decided.

## IX.

[¶ 21] For all of these reasons and those previously articulated by the District Court and this Court in *Archambault I*, 174 F.Supp.2d at 1010–17, 1018–31, it is hereby

[¶ 22] RECOMMENDED that Archambault's Motion to Dismiss Indictment, Docket No. 132, be DENIED in its entirety and with prejudice.

### NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendation for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendation before the assigned United States District Judge.** *See* **28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72.**